Raymond A. HAMILTON, Plaintiff,

v.

NATIONAL PROPANE, Defendant.

No. 01–C–0141–C.

United States District Court,
W.D. Wisconsin.

Feb. 14, 2002.

Victor M. Arellano, for plaintiff.

Fredric Fischer, Seyfarth, Shaw & Fairweather, Chicago, IL, for defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34. Plaintiff Raymond A. Hamilton alleges in its amended complaint that defendant National Propane wrongly terminated his employment on the basis of his age in violation of the ADEA and retaliated against him by withholding his severance pay until he signed a release. Subject matter jurisdiction is present under 28 U.S.C. § 1331.

As a preliminary matter, I note that in plaintiff's original complaint he named two defendants in the caption, National Propane and "David Bertelser." David Bertelsen filed a motion to have himself dismissed from the case. Instead of responding to the motion to dismiss, plaintiff filed an amended complaint naming National Propane only as a defendant. From his actions, I understand plaintiff to be stipulating to Bertlesen's motion to dismiss.

Presently before the court is defendant's motion for summary judgment. Because I find that plaintiff has met his prima facie and pretext burdens on his age discrimination claim but has failed to meet his prima facie burden on his retaliation claim, defendant's motion for summary judgment will be denied as to plaintiff's age discrimination claim and granted as to plaintiff's retaliation claim.

From the proposed findings of fact and the record, I find the following material facts to be undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Raymond A. Hamilton is a resident of Wisconsin. Plaintiff worked at

defendant National Propane from July 16, 1986, until May 11, 1999. Plaintiff was born on November 1, 1940, and was 58 years old when he was terminated.

Defendant National Propane was a Wisconsin corporation with headquarters in Cedar Rapids, Iowa, until it was acquired by Columbia Propane on or about July 19, 1999. Columbia Propane is a Delaware corporation located in Richmond, Virginia.

### B. *Background*

On July 16, 1986, plaintiff was hired by defendant as a district manager. Ten years later, in early 1996, plaintiff became an area manager for the Woodruff district in Wisconsin. At the time he was terminated, plaintiff was an area manager who oversaw the operations of five Wisconsin districts (Rhinelander, Eagle River, Amberg, Crandon and Antigo) and ran the day-to-day operations for the one these districts (Rhinelander). The district manager in each district reported to plaintiff.

Plaintiff reported to David Bertelsen (age 43), the general manager of the upper Midwest region. Bertelsen is responsible for the hiring, firing and reorganization of employees in his region. The upper Midwest region consists of Wisconsin, Minnesota and Michigan. At the time of plaintiff's termination, eight area managers reported to Bertelsen, including plaintiff (age 58), David Vandre (age 55), Gary Finlayson (age 54), Leland Schmidt (age 45), Tom Kirby (age 43), Jon Smolinski (age 43), John Pianki (age 40) and Joseph Ugolini (age 37). Plaintiff, Vandre and Ugolini oversaw operations in Wisconsin; the other area managers oversaw operations in Minnesota and Michigan.

Defendant began experiencing financial troubles in late 1997. As a result of these financial difficulties, on three separate occasions, in the fall of 1997, early spring of 1998 and mid–1998, Bertelsen merged various districts in the upper Midwest region and terminated eight employees, including Steve Miller, an area manager in Michigan. In 1998, defendant reported a $31.2 million decline in revenues. In late 1998, defendant's credit rating was downgraded.

To address growing concerns over the impending sale of National Propane and layoffs, on January 29, 1999, defendant offered a "stay pay bonus," under which any covered or eligible employee who was terminated before July 1, 1999, would be entitled to a lump-sum payment equal to 30% of his or her base salary unless the termination was by resignation, death or "good cause." Plaintiff was eligible for this program. The stay pay bonus agreement included an option allowing the parties to amend its terms in writing by mutual agreement. On February 3, 1999, plaintiff opted to participate in the stay pay bonus program.

### C. *Performance Reviews and Absorbing Plaintiff's Duties*

An employee's overall annual performance is made up of two separate components, an objective evaluation and a qualitative evaluation. The objective evaluation consists of measurable goals (for example, whether percentage of gallons sold increased or decreased, whether margins were attained and whether gross profit increased or decreased), which are each multiplied by that category's weighted value. The qualitative evaluation consists of subjective assessments (for example, planning and organizing, motivation and teamwork, and employee development), each of which is rated on a five-point scale, from 0 to 4. The numeric values on the qualitative rating scale are defined as follows: 0 is unacceptable; 1 is marginal; 2 is expected; 3 is above expected; and 4 is exceptional. The mid-range value, "expected," is defined as "[p]erformance [that] meets all standards and expectations."

The total objective and qualitative points are added together to give an overall performance rating on the overall performance rating scale: 0 to 20 points is unacceptable; 21 to 30 points is marginal; 31 to 84 points is expected; 85 to 89 points is above expected; and 90 to 100 points is exceptional. The overall "expected" category is defined as "results achieved satisfy most accountabilities in an acceptable manner, low end needs training, high end is a seasoned employee."

### 1. *Plaintiff's performance reviews*

On plaintiff's 1998 performance review, Bertelsen ranked plaintiff's qualitative performance in the Motivation and Teamwork category as a "2" (that is, "expected") and commented that "I sense some old school I'm the Boss on occasion"; in the Employee Development category as a "2" and commented to "Mentor + Train your successor"; and in the overall comment section noted to "stop the Cedar Rapids vs. Field—us + them mentality." Plaintiff received an overall performance score of 37 on his 1998 performance review, which fell within the overall "expected" range. Plaintiff received a wage increase.

On plaintiff's 1999 performance review, Bertelsen ranked plaintiff's qualitative performance in the Motivation and Teamwork category as a "2" and commented that "Still has nature to intimidate employees. Listen Better"; in the Employee Development category as a "2" and commented, "Successor? Trainee?"; and in the overall comments section noted to "Use a more positive approach when dealing with Cedar Rapids staff H.R.—Legal—Safety, etc." Plaintiff received an overall performance score of 59 and a wage increase.

Bertelsen never disciplined plaintiff or any other subordinate in writing because it was contrary to his management style. (The parties dispute whether Bertelsen informed plaintiff verbally of concerns he had with plaintiff's management style, attitude or professionalism.) Plaintiff never received any complaints from his subordinates regarding his management style. Bertelsen never recommended withholding a pay increase from plaintiff. Above the space provided for signatures, the performance evaluation form states, "[a]n employee signature does not necessarily signify agreement with the appraisal; it simply means that the appraisal has been discussed and the employee has had the opportunity to make comments." (Plaintiff states that his evaluations were mailed to him. Defendant states that plaintiff dated his signature on his 1998 performance evaluation the same date as Bertelsen, April 15, 1998.) Bertelsen has a team-oriented management style and expects his subordinates to operate under this philosophy.

### 2. *Absorbing plaintiff's duties*

On November 3, 1997, Bertelsen hired Joseph Ugolini, as an area manager. Ugolini, age 37, was assigned two districts, Woodruff and Mercer, that had been supervised by plaintiff. (According to defendant, plaintiff had been managing Woodruff and Mercer in addition to his designated area and, therefore, plaintiff was not "removed" from these districts.) Before working for defendant, Ugolini had supervised one employee for nine months (at Gasco) and four employees for approximately eight years (at Skelgas). At Skelgas, Ugolini had reported to Bertelsen (who also had been employed by Skelgas) for nine months.

On plaintiff's termination, Ugolini absorbed most of plaintiff's duties in terms of number of districts managed, that is, Ugolini absorbed four of plaintiff's districts and David Vandre, age 55, absorbed one of plaintiff's districts (Antigo). After plaintiff's area had been absorbed by Ugolini

and Vandre, Ugolini was responsible for overseeing the operations of five districts and Vandre oversaw four districts. Each was responsible for approximately half the state of Wisconsin; each supervised approximately the same number of subordinates; and each was responsible for the same number of gallons of product.

### 3. *Ugolini's performance reviews*

In Ugolini's 1998 performance review, he had no qualitative rankings because Bertelsen noted that it was "N/A New hire Late Fall 1997." In the overall comment section, Bertelsen noted, among other things, that "I am confident you were the missing piece to the puzzle of Northern Wisconsin." In Ugolini's 1999 performance review, Bertelsen ranked Ugolini's qualitative performance in the Motivation and Teamwork category as a "2" and gave Ugolini an overall performance rating of 59 points. In his 2000 performance review, Ugolini received an overall performance rating of 61 points. In August 2000, after plaintiff had been terminated, Ugolini's salary was reduced from $41,200 to $34,000 as part of an organizational restructuring in which Ugolini was demoted from area manager to regional sales manager.

### 4. *Train your successor comments*

According to Bertelsen, the "mentor and train your successor" comments in plaintiff's 1998 and 1999 performance reviews were a standard instruction that he had used since 1983. The instruction meant that if an employee was promoted or left the company, Bertelsen expected someone to step in and assume that employee's position. (The parties dispute whether Bertelsen explained to plaintiff the meaning of his "mentor and train your successor" comments.) Bertelsen never instructed Ugolini in writing to train a successor. According to Bertelsen, Ugolini's performance in this area was "very good."

In Tom Kirby's (age 43) 1998 and 1999 performance reviews, Bertelsen wrote, "Select + Mentor your replacement for future advancement" and "Replacement? Trainee," respectively. In Leland Schmidt's (age 45) 1999 performance review, Bertelsen wrote, "Mentor your replacement." In Jon Samolinski's (age 43) 1998, 1999 and 2000 performance reviews, Bertelsen wrote, "Select + mentor your replacement for future advancement," "Select + Mentor Your replace for future" and "Continue to Mentor your replacements for the future," respectively. Vandre (age 55) and Finlayson (age 54) never received "train your successor" language in their performance reviews.

### D. *Plaintiff's Termination*

Bertelsen decided to eliminate one Wisconsin area manager because of the company's poor economic conditions. (Bertelsen cannot recall the specific date he decided to downsize the area manager position.) Bertelsen had no directive from his superiors to implement a reduction in force or to eliminate plaintiff's position. No other employee (including Bertelsen's superiors) knew that Bertelsen was downsizing his region until he chose plaintiff for termination, a decision he made one week before the termination. In 1998, Bertelsen had received a directive from his superiors to downsize. In response, he eliminated Steve Miller's area manager position in Michigan as well as seven other positions. Miller was 50 years old. Bertelsen had determined that there was customer erosion in Wisconsin. According to the 1999 performance evaluations, plaintiff's area had a 26% decrease in gallons of product sold, Ugolini's area had a 18% decrease and Vandre's area had a 16% decrease. Bertelsen believed that the three Wisconsin area managers (plaintiff, Ugolini and Vandre) had comparable technical skills,

but that Ugolini and Vandre had better managerial and interpersonal skills than plaintiff. Neither Vandre nor Ugolini had ever been counseled in their performance reviews for intimidating employees or for not having a positive attitude with headquarters staff.

On May 4, 1999, plaintiff telephoned Peggy Conrad, payroll clerk at the Cedar Rapids headquarters, to inquire about the lack of a paycheck for one of his subordinates. According to Conrad, plaintiff was verbally abusive. Conrad asked Heather Maloney, a human resources worker, to take plaintiff's call. According to Maloney, plaintiff was rude and unprofessional during their conversation. According to plaintiff, he never yelled or raised his voice and was not abusive or unprofessional to either Conrad or Maloney. Maloney told plaintiff that she needed a "final okay" in order to add his subordinate to the payroll and plaintiff stated to her that he would contact Bertelsen to get the "final okay." Maloney was upset by plaintiff's telephone call and contacted Bertelsen to tell him what had transpired. Maloney described plaintiff as being upset during their telephone call. According to plaintiff, the same day he spoke with Maloney he left two messages on Bertelsen's voice mail regarding payroll's need for Bertelsen's authorization to add the new employee to the payroll. (Bertelsen states that he spoke with plaintiff, who admitted that he had spoken "sternly" to Conrad and Maloney. Plaintiff states that Bertelsen never spoke to him from the day he spoke with Conrad and Maloney, May 4, until the day he was terminated, May 11.) Neither Maloney nor Conrad filed a written complaint regarding the incident.

According to Bertelsen, the Maloney and Conrad incident was the "last straw." He decided to eliminate plaintiff's position as a part of the downsizing because of this incident. Bertelsen states that plaintiff was not terminated because of misconduct; he was terminated because of downsizing. (Plaintiff disputes that he was terminated because of either downsizing or misconduct and states that he was terminated on the basis of his age.) Plaintiff's personnel file does not indicate that he was terminated because of misconduct. On defendant's "Employee Resignation/Termination" form, Bertelsen did not check any reason for plaintiff's involuntary termination, although "insubordination," "misconduct" or "performance" were among the offered choices. A week before plaintiff was terminated, Bertelsen informed Jim Schreiber, human resource manager, and David Watson, defendant's general counsel, that he would be downsizing plaintiff's position because of the recent incident with Maloney and Conrad. This was the first time that any other employees within the company became aware that Bertelsen was downsizing his region. It was company policy to notify human resources whenever an employee is terminated.

On May 11, 1999, Bertelsen and Rick Smith, controller for the upper Midwest region, met plaintiff at a hotel in Rhinelander, Wisconsin. Bertelsen informed plaintiff that he was being terminated effective that same day. (Bertelsen states he told plaintiff he was being terminated because of necessary downsizing in Wisconsin in order to cut expenses. Plaintiff states he was told he was being terminated because three areas were being reduced to two.) Bertelsen told plaintiff that he had been chosen for termination because "it was [Bertelsen's] decision to make, and there was nobody else to blame."

### E. *Separation Agreement*

During the termination meeting at the hotel, Bertelsen gave plaintiff a separation agreement. The agreement offered plaintiff 50% of his salary as severance in lieu of the 30% stay pay bonus if plaintiff would

agree to sign a release of all legal claims against the company, including claims of age discrimination. Bertelsen told plaintiff that he had 21 days to accept or reject the separation agreement and that he could consult with an attorney about the terms of the agreement. (The parties dispute whether plaintiff was told that he had to sign the separation agreement in order to receive either of the severance packages.)

On May 14, 1999, plaintiff contacted David Watson, defendant's general counsel, to ask for written confirmation that the separation agreement's non-compete provision would not prohibit plaintiff from working at another propane company. The same day, Watson replied in writing, agreeing to plaintiff's interpretation.

On June 18, 1999, defendant received a letter from plaintiff's attorney stating that plaintiff's stay pay bonus had been denied improperly. In a letter dated June 22, 1999, defendant responded that it was awaiting plaintiff's acceptance or rejection of the separation agreement. (The separation agreement allowed for acceptance only: there was no designated area to sign or mark indicating rejection.) In the letter, defendant stated that if the separation agreement was accepted, defendant would pay plaintiff 50% of his salary; if it was rejected, then it would pay 30% under the original stay pay bonus agreement. On July 1, 1999, defendant received plaintiff's rejection of the separation agreement from plaintiff's attorney. On July 19, 1999, plaintiff received his 30% stay pay bonus, seven weeks after the 21–day review period had expired.

### F. *Drafting Maloney's Affidavit*

On November 24, 2001, Maloney telephoned plaintiff's counsel in response to a notice of deposition that she had received from him. Maloney spoke with a paralegal at the office, Cheri Garcia, and described the telephone incident involving plaintiff.

At Maloney's request, Garcia drafted an affidavit to take the place of a deposition. Garcia read the proposed affidavit to Maloney over the telephone. At Maloney's direction, Garcia made changes to the proposed affidavit, including changes to the following sentence, which originally read, "[a]ffiant affirms that at no time during the above described telephone incident did [plaintiff] act in any disrespectful and/or unprofessional manner towards [Maloney]." Maloney directed Garcia to delete "unprofessional" from this sentence. Garcia crossed out the word "unprofessional" wrote above it, "no objections to using the word disrespectful." The resulting sentence read, "[a]ffiant affirms that at no time during the above described telephone incident did [plaintiff] act in any disrespectful manner towards [Maloney]." On November 30, 2001, Garcia faxed the affidavit (with the revised sentence) to Maloney for her signature. (Garcia states that Maloney had agreed to sign the affidavit as it read with the changes that Garcia had just made. Maloney states that she did not agree to sign the affidavit until after she reviewed it because she was uncomfortable with parts of it.)

On December 3, 2001, Maloney faxed the unsigned affidavit back to Garcia with the words "disrespectful manner towards [Maloney]" crossed out. Maloney deleted the disrespectful language because she believed that this statement placed too much blame on her, the payroll department and human resources. The same day, Garcia telephoned Maloney to ask about the deletion. Maloney stated that she had been contacted by defendant's counsel, who discussed the proposed affidavit with her. On December 7, 2001, plaintiff's attorney deposed Maloney. The night before Maloney's deposition, defendant's counsel (who had gone to high school with Maloney's ex-husband) had pizza at Maloney's home.

## OPINION

### A. *Age Discrimination Claim*

■ The Age Discrimination in Employment Act makes it unlawful for an employer "to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). This protection extends to employees who are between 40 and 70 years old. *See* 29 U.S.C. § 631(a). To succeed on an ADEA claim, a plaintiff must show that he would not have been terminated "but for" his employer's intentional age-based discrimination. *See Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 396 (7th Cir. 1997);

■ A plaintiff may prove age discrimination by either presenting direct evidence or setting forth a prima facie case under the *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting framework. *Chiaramonte* 129 F.3d at 396; *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (noting that *McDonnell Douglas* framework applies in ADEA cases when parties do not dispute it). Under either the direct or indirect method, summary judgment is inappropriate if plaintiff offers evidence from which an inference of discrimination may be drawn. *See Miller v. Borden, Inc.,* 168 F.3d 308, 312 (7th Cir.1999).

■ To make out a prima facie case in a reduction-in-force context, plaintiff must show the following four *McDonnell Douglas* elements: (1) he was in the protected age class (40 to 70 years of age); (2) he was meeting his employer's legitimate expectations; (3) he was discharged; and (4) and persons not in the protected class were treated more favorably. *See Cianci v. Pettibone Corp.,* 152 F.3d 723, 728 (7th Cir.1998); *Bellaver v. Quanex Corp.,* 200 F.3d 485, 493–94 (7th Cir.2000). With respect to the fourth prong, "an inference [of age discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Rather, "a plaintiff must show that he was replaced by someone 'substantially younger,' although not necessarily outside the protected class." *Richter v. Hook–SupeRx, Inc.,* 142 F.3d 1024, 1028 (7th Cir.1998). The Court of Appeals for the Seventh Circuit considers that a ten-year age difference is "presumptively substantial." *Hoffmann v. Primedia Special Interest Publications,* 217 F.3d 522, 524 (7th Cir.2000) (citing *O'Connor,* 517 U.S. at 313, 116 S.Ct. 1307).

■ If plaintiff makes such a prima facie case, the burden of production shifts to defendant to offer an legitimate, non-discriminatory explanation for its actions, after which plaintiff will have an opportunity to show that defendant's explanation is a pretext for unlawful discrimination. *See, e.g., Darnell v. Target Stores,* 16 F.3d 174, 177 (7th Cir.1994); *Testerman v. EDS Technical Products Corp.,* 98 F.3d 297 (7th Cir.1996) (plaintiff must show that reason offered was not employer's true reason but instead was cover for discrimination). At all times the ultimate burden of persuasion remains with the plaintiff. *See Weisbrot v. Medical College of Wisconsin,* 79 F.3d 677, 681 (7th Cir.1996).

Plaintiff was 58 years old and thus a member of the protected class when he suffered the adverse employment action of termination. Defendant does not dispute that plaintiff satisfies the first and third prongs of the *McDonnell Douglas* prima facie case (he is in the protected class and he was discharged). Instead, defendant focuses on the remaining two prongs, ar-

guing that plaintiff was not meeting its legitimate expectations and that other persons not in the protected class were not treated more favorably. Rather, plaintiff's duties were partially absorbed by Vandre who is also a member of the protected class and only three years younger than plaintiff.

### 1. Meeting defendant's legitimate expectations

■ Plaintiff argues that he was meeting defendant's legitimate expectations as evidenced by his annual performance reviews and pay raises. Defendant does not dispute that Bertelsen considered plaintiff to have technical skills equal to those of the other two Wisconsin area managers who were retained, Ugolini and Vandre, but it argues that plaintiff had demonstrated poor managerial and interpersonal skills and, thus, he was not meeting its legitimate expectations.

Plaintiff's 1998 and 1999 performance reviews indicate that he received an overall performance rating of "expected." Even in the subjective, qualitative categories in which Bertelsen criticized plaintiff by stating, for example, that "I sense some old school I'm the boss on occasion" (in 1998) and "still has nature to intimidate employees. Listen Better" (in 1999), plaintiff received a rating of "2" in each instance. According to the performance review form, a "2" equals "expected," which is defined on that form as "[p]erformance [that] meets all standards and expectations." In fact, in 1998 and 1999, plaintiff did not receive a rating below "expected," or "2," in any qualitative category.

Plaintiff's 1999 annual performance review was completed on April 21, 1999, approximately three weeks before plaintiff was terminated. In other words, even the annual performance review completed just before plaintiff's termination indicates that he was meeting all of defendant's legiti-

mate expectations and standards. *See Johnson v. Zema Systems Corp.,* 170 F.3d 734, 743 (7th Cir.1999) ("[Plaintiff] bears a burden only of producing some evidence that he was meeting [defendant's] legitimate expectations. In coming forward with consistently positive employment evaluations ... [plaintiff] has met his burden.").

From defendant's comments in the performance reviews, a reasonable jury might well conclude that plaintiff was not meeting defendant's legitimate expectations. On the other hand, putting Bertelsen's reprimands in the context of plaintiff's favorable evaluations, a reasonable jury might conclude that plaintiff was meeting defendant's legitimate expectations. In any event, plaintiff has raised a genuine issue of material fact. *See id.* ("By introducing sufficient evidence that [plaintiff] met [defendant's] legitimate expectations, [plaintiff] has raised a genuine issue of material fact."). Plaintiff has met this prong of his prima facie case.

### 2. Substantially younger employees treated more favorably

In this case, a single employee was discharged and his duties were absorbed by two existing employees. This type of reduction in force has been dubbed a "mini-RIF" or "fungibility." *Bellaver,* 200 F.3d at 495; *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1331 (7th Cir.1995). "[W]hen an employer, in the course of restructuring the business, terminates an employee and does not replace the terminated employee, but arranges affairs so that the responsibilities of the terminated employee are absorbed by other employees, the inference of discrimination ... is premised on some degree of fungibility between the terminated employee's job and the younger employee's job," *Miller,* 168 F.3d at 313 (internal quotations and

brackets omitted) (citing *Gadsby,* 71 F.3d at 1331). The "fungibility of jobs is implicit when the terminated employee's responsibilities are absorbed by other employees." *Gadsby,* 71 F.3d at 1331.

 Defendant argues first that plaintiff was not similarly situated to Ugolini and Vandre because these employees did not intimidate employees or have difficulty working with staff. Regardless whether "similarly situated" encompasses the alleged personal character deficiencies rather than merely a comparison of job duties, a showing of "similarly situated" is not required in a mini-RIF case such as this one. *See Michas v. Health Cost Controls of Illinois, Inc.* 209 F.3d 687, 693 (7th Cir.2000) ("Because of the fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job, we have dispensed with the requirement that the plaintiff show 'similarly situated' employees who were treated more favorably. . . . we only require that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class."); *Bellaver,* 200 F.3d at 495. ("The plaintiff in a single-discharge case does not need to make a showing that 'similarly situated' employees were treated better because the inference of discrimination arises from the fact that they were constructively 'replaced' by workers outside of the protected class.").

It is undisputed that Ugolini absorbed most of plaintiff's duties, in terms of districts managed, because he was assigned four of plaintiff's five districts. Nevertheless, defendant argues that, in terms of gallons of product and number of subordinates, plaintiff's duties were absorbed equally by Ugolini and Vandre. However, that is not borne out by Ugolini's and Vandre's affidavits in support of this proposed finding of fact. Rather, the affiants

each indicate that *after* absorbing plaintiff's duties, the two managers were responsible for the same number of subordinates and gallons of product. Therefore, without knowing whether Ugolini and Vandre were responsible for the same number of subordinates and gallons of product *before* plaintiff was terminated or that the Antigo district (the only district absorbed by Vandre) constituted half of plaintiff's total duties in terms of subordinates and gallons of product (facts not alleged by either party), it is impossible to conclude that plaintiff's duties were absorbed evenly in terms of subordinates and gallons of product. In any event, Ugolini and Vandre both absorbed plaintiff's duties and, more specifically, Ugolini absorbed four of plaintiff's five districts. Viewing the evidence in the light most favorable to plaintiff, as I must on this motion for summary judgment, the undisputed facts indicate that Ugolini absorbed most of plaintiff's duties.

 Nevertheless, the question remains whether plaintiff can establish his prima facie case if his duties were absorbed mostly by Ugolini, who was 37 years old (thus, is not in the protected class and whose age difference, 21 years, is presumptively substantial), and partially by Vandre, who was 55 years old (thus, is in the protected class and whose age difference, three years, is presumptively insubstantial). In *O'Connor,* the Supreme Court held that "[t]he fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he lost out *because of his age.*" *O'Connor,* 517 U.S. at 312, 116 S.Ct. 1307 (emphasis in original). Moreover, in *Bellaver,* the Court of Appeals for the Seventh Circuit noted that it had upheld a jury finding of age discrimination in another case where plaintiff's duties "were absorbed *mostly* by younger workers who

retained their jobs during a departmental restructuring." *Bellaver*, 200 F.3d at 495 (emphasis added); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997) ("An employer must not be allowed to get around ... the *McDonnell Douglas* formula, by fractionating an employee's job."). At minimum, case law indicates that plaintiff's duties need to be absorbed mostly by substantially younger employees, not entirely. Therefore, I do not find that plaintiff's prima facie case is defeated by the fact that Vandre also absorbed some of plaintiff's duties.

Because plaintiff has introduced evidence that Ugolini, a substantially younger employee, absorbed most of his duties, he has met this last prong of his prima facie case. Therefore, the burden shifts to defendant to offer an legitimate explanation for terminating plaintiff's position.

### 3. Defendant's explanation for plaintiff's termination

■■■ When the "burden" shifts to the employer, this "burden is one of production, not persuasion: it can involve no credibility assessment." *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097. It is undisputed that Bertelsen believed plaintiff, Ugolini and Vandre had comparable technical skills. Defendant asserts that Bertelsen retained Ugolini and Vandre over plaintiff because they had better interpersonal and managerial skills than plaintiff, as exemplified by the Maloney and Conrad incident. Defendant argues that Bertelsen decided to eliminate one of the three Wisconsin area manager positions as part of a downsizing and that, after Bertelsen received the report from Maloney regarding plaintiff's allegedly abusive telephone interaction with her, he chose to downsize plaintiff's position. In other words, with all technical skills being equal, the determining factor in downsizing plaintiff's position was the incident with Maloney and Conrad. This is a legitimate explanation. *See*

*id.* ("[defendant] met this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired" for the proffered reason). The burden shifts to plaintiff to show that this explanation is a pretext for unlawful age discrimination.

### 4. Pretext for unlawful discrimination

■■■ There are two methods for showing pretext. "Pretext may be established directly with evidence that the employer was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir.1996) (internal citations and brackets omitted). "Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'" *Wolf* 77 F.3d at 919 (citing *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995)).

■■■ Plaintiff has not introduced any direct evidence of pretext. Although plaintiff argues that Bertelsen's comments in his 1998 and 1999 performance reviews that (1) "I sense some old school I'm the Boss on occasion" and (2) plaintiff should "mentor and train [his] successor" are demonstrative of age-based animus, these comments simply do not rise to the level of direct evidence of pretext. *See Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir.1998) ("common experience suggests that one's age has no necessary correlation to whether or not one's ideas are 'young' or 'fresh'"); *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403 (7th Cir.1996) (no inference of discrimination where plaintiff's supervisor stated preference for "young people fresh out of college" and "[n]o, I don't want older people, we want young people we can mold").

Under the method of proving pretext indirectly, once the employer offers a legitimate, non-discriminatory reason for plaintiff's termination, "plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence."' *Wolf*, 77 F.3d at 919 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Holland v. Jefferson National Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir. 1989)) (showing of pretext "can be accomplished, [by showing] through circumstantial evidence, that employer's articulated explanation is not worthy of credence"). As in the law of evidence, in age discrimination cases the factfinder is entitled to treat a party's dishonesty about a material fact as affirmative evidence of guilt. *See Reeves*, 530 U.S. at 147, 120 S.Ct. 2097.

Plaintiff can show pretext indirectly by "introducing evidence that demonstrates that (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge." *Wolf*, 77 F.3d at 919. However, a court will not evaluate whether the employer made a mistake or a bad decision but " 'whether the employer honestly believes in the reasons it offers ....'" *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1145 (7th Cir.1994) (quoting *Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 156–57 (7th Cir.1994)); *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir.1997) ("The pretext inquiry focuses on the honesty—not the accuracy—of the employer's stated reason for the termination.").

Although defendant has proffered one explanation for plaintiff's termination (a downsizing in which the determining factor in choosing plaintiff's position was his poor interpersonal and managerial skills as exemplified by the allegedly rude and abusive incident with Maloney and Conrad), I will nevertheless address these two issues (downsizing and interpersonal and managerial skills) separately for purposes of discussion only.

a. Downsizing

It is undisputed that defendant was suffering financial problems and that the financial troubles began in late 1997. In response, from the fall of 1997 until mid–1998, Bertelsen consolidated the upper Midwest region on three separate occasions and eliminated eight positions. Nevertheless, during this period of reorganizations and layoffs, defendant hired Ugolini on November 3, 1997, and assigned him the Mercer and Woodruff districts, which plaintiff had been overseeing. Plaintiff alleges that transferring these two districts from him to Ugolini was the beginning of defendant's plan to replace him with Ugolini, a substantially younger worker. For additional support of this theory, plaintiff points to Ugolini's 1998 performance review, which was completed approximately five months after he had been hired, in which Bertelsen stated that "I am confident that you were the missing piece of the puzzle of Northern Wisconsin." Northern Wisconsin was plaintiff's region.

Plaintiff also argues that defendant's proffered explanation that his termination in 1999 was the result of a downsizing is pretextual because Bertelsen received no such directive from his superiors. In 1998, Bertelsen had received a directive from his superiors to downsize but defendant has offered no evidence that Bertelsen has ever downsized without a directive from his superiors other than in 1999. In addition, it is undisputed that neither Bertelsen's superiors nor anyone else in the com-

pany knew that Bertelsen was going to be downsizing his region until he chose plaintiff for elimination, which was one week before plaintiff was terminated. It was not until this point that Bertelsen informed the human resource manager, Jim Schreiber, and defendant's general counsel, David Watson, that he was eliminating plaintiff's position as part of a downsizing. Moreover, because it was company policy to notify human resources when an employee is terminated, this notification does not necessarily indicate that Bertelsen was conducting an official downsizing.

Defendant points to the fact that Ugolini was eventually demoted after plaintiff was terminated and that Vandre, the older employee, was retained as an area manager in order to bolster its position that defendant had not engaged in age-based discrimination. However, plaintiff had already notified defendant of his intention to file an age discrimination lawsuit. Therefore, this fact can also be interpreted as defendant's retaining the older employee because it was facing an age discrimination lawsuit. In any event, defendant's post-termination actions are irrelevant to the question whether it discriminated against plaintiff on the basis of age. *See, e.g., Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein*, 96 F.Supp.2d 763, 772 (N.D.Ill.2000) ("post-termination actions do not constitute evidence supporting an inference that the [employer's] stated reasons were false").

Plaintiff has offered sufficient circumstantial evidence to suggest that defendant's articulated explanation that it terminated plaintiff as a result of a downsizing is not worthy of credence. Therefore, plaintiff has met his burden of showing pretext with respect to the downsizing.

b. Interpersonal and managerial skills

Plaintiff argues that defendant fabricated plaintiff's "attitude" problems after he was terminated. It is true that the parties dispute whether Bertelsen had ever counseled plaintiff verbally about his allegedly poor interpersonal and managerial skills. However, plaintiff's performance reviews indicate that he was told in 1999, before he was terminated, that he "Still has nature to intimidate employees. Listen Better." and "Use a more positive approach when dealing with Cedar Rapids staff H.R.—Legal—Safety, etc." Therefore, plaintiff was notified about defendant's concerns with his interpersonal and managerial skills. Nevertheless, because of the favorable performance ratings that accompanied these comments, it is unclear whether these comments were merely constructive criticism or an indication that something serious was afoot. Specifically, plaintiff received "expected" ratings in these categories, which indicates that his "performance meets all standards and expectations," according to the performance review itself. The net result is that there is a dichotomy between the comments as defendant interprets them today (as voiced through litigation) and the comments as defendant interpreted them at the time of the review (as voiced through its rating of "expected"). Because the performance ratings contradict defendant's current stance as to the serious nature of the comments, any ambiguity in the comments versus the ratings will be resolved in favor of plaintiff. *See Russell v. Acme–Evans Co.*, 51 F.3d 64 (7th Cir. 1995) ("on summary judgment, interpretive ambiguities must be resolved in favor of the nonmoving party"). Therefore, for purposes of this motion, I infer from the ratings that plaintiff was meeting defendant's expectations in the areas of interpersonal and managerial skills.

Defendant argues that plaintiff puts forth only his own perceptions of himself as having adequate interpersonal and managerial skills. However, the performance

reviews are not plaintiff's perception of himself; they are defendant's perception of plaintiff and, as such, are independent evidence that show (viewing all evidence in favor of the non-moving party) that he was meeting all defendant's expectations and standards. *See Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir.1999) ("an employee's general averments that he performed adequately are insufficient to create a genuine issue of fact ... [Plaintiff] must produce some independent evidence showing that the company's motives are not believable."). Moreover, plaintiff's 1999 performance review, in which defendant rated him as meeting its expectations, occurred three weeks before he was terminated. *See Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 15, 19 (7th Cir.1987) (extremely good review two months before firing relevant to showing pretext), *overruled on other grounds; cf. Roberts*, 172 F.3d at 452 (performance review that occurred ten months before "bad attitude" termination decision was not enough to show pretext).

Defendant argues that the fact that plaintiff's performance was rated "expected" is irrelevant to show pretext. Defendant points to several cases in support of this proposition, including *Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216 (7th Cir.1991). In *Aungst*, the Court of Appeals for the Seventh Circuit minimized the employee's positive performance reviews because they did not address directly the employer's specific explanation for terminating the employee, namely, the employer's need for versatility. *Id.* at 1223. In other words, the employee's rebuttal evidence (to show pretext) had to focus on the specific proffered explanation of versatility, which it did not. *Id.* Therefore, the employee failed to show pretext because his rebuttal evidence did not focus on the employer's specific explanation. *Id.* In this case, defendant has proffered the explanation that it chose plaintiff for

downsizing because of the Maloney and Conrad incident. As explained earlier, plaintiff has adduced circumstantial evidence indicating that the proffered reason of downsizing is not worthy of credence. Moreover, plaintiff has offered direct, contradictory and independent evidence that he was meeting all of defendant's interpersonal and managerial expectations and standards (as defined by defendant) less than three weeks before he had been terminated. In contrast to the facts in *Aungst*, plaintiff's rebuttal evidence in this case focuses directly on defendant's explanation that plaintiff was downsized because of the Maloney and Conrad incident. *See id.*

Plaintiff disputes that he was ever rude, abusive or unprofessional to either Maloney or Conrad. Nevertheless, the pretext inquiry focuses on the honesty, not the accuracy, of the employer's stated reason for the termination. *See Tincher*, 118 F.3d at 1130. Defendant argues that even if Bertelsen was mistaken and plaintiff had not been rude or unprofessional in his conversations with Maloney and Conrad, Bertelsen held an honest belief that plaintiff acted otherwise. Pretext requires more than a showing that the employer was "mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir.2000); *see also O'Connor v. DePaul University*, 123 F.3d 665, 671 (7th Cir.1997) ("On the issue of pretext, our only concern is the honesty of the employer's explanation ..."). The Court of Appeals for the Seventh Circuit has warned repeatedly that a court does not sit as a super-personnel department that reexamines an entity's business decision and reviews the propriety of the decision. *See Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir.2000); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.

1986). However, even in the context of that admonition, the court of appeals has stated that "we need not abandon good reason and common sense in assessing an employer's actions." *Gordon v. United Airlines, Inc.,* 246 F.3d 878, 889 (7th Cir. 2001). "Our cases therefore have acknowledged that we need not take an employer at its word." *Id.*

According to Bertelsen, Maloney telephoned him, stating that plaintiff had been rude and unprofessional. The parties dispute whether Bertelsen contacted plaintiff to get his version of the incident. It is unclear from the proposed facts whether Bertelsen contacted Conrad to get her version of the incident. The preparation of Maloney's affidavit comes into play at this juncture as well. According to Cheri Garcia, a paralegal for plaintiff's counsel, Maloney was initially satisfied with the statement that plaintiff had not acted in any disrespectful manner towards her, but was dissatisfied with the statement that plaintiff had not acted in any unprofessional manner towards her. After Maloney was contacted by defendant's counsel, she changed the proposed affidavit by striking out the statement that plaintiff had not acted in any disrespectful manner towards her because she believed that this statement placed too much blame on her, the payroll department and human resources. When viewing the evidence in the light most favorable to the non-moving party, Maloney's testimony may be suspect. At a minimum, a factfinder may need to know Maloney's understanding of the connotations of the words unprofessional and disrespectful.

Even if defendant held an honest belief that plaintiff had been rude and abusive to Maloney and Conrad (which might very well be the case), it never proffered this explanation for plaintiff's termination. *See Gordon,* 246 F.3d at 889 ("[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation") (internal citations omitted). Instead, defendant alleges unequivocally that plaintiff was downsized, albeit because he had been allegedly rude and abusive to Maloney and Conrad. Defendant never alleges that plaintiff was terminated because of the Maloney and Conrad incident in and of itself, which would be an independent explanation.

The critical determination for the jury will be whether Bertelsen was engaged in downsizing when he chose plaintiff for termination. If plaintiff is able to convince the jury that downsizing was not the true reason for his termination, it will be relatively easy for him to prove that his allegedly rude telephone conversation was not the true reason either. Conversely, if plaintiff cannot convince a jury that Bertelsen was not engaged in downsizing, it will be difficult for him to prove that Bertelsen's decision to choose him for termination was a pretext for age discrimination in light of Bertelsen's perception that he had been rude to co-workers.

Because plaintiff has offered sufficient circumstantial evidence that defendant's articulated explanation that it terminated plaintiff as a result of a downsizing is not worthy of credence, I will deny defendant's motion for summary judgment as to the claim of age discrimination.

### B. *Retaliation Claim*

Plaintiff argues that he suffered an adverse employment action when his stay pay bonus was withheld for seven weeks. On the day he was terminated, plaintiff was offered a separation agreement that stated that he would receive 50% of his base salary "in lieu of" his 30% stay-pay bonus if he agreed to sign a release of all legal claims against defendant. The stay pay bonus agreement required defendant

to issue payment within 30 days of plaintiff's termination. Therefore, defendant was required to issue plaintiff's stay pay bonus no later than June 11, 1999.

It is undisputed that Bertelsen told plaintiff that he had 21 days to reject or accept the separation agreement. Moreover, the separation agreement itself states that plaintiff has 21 days "to consider whether or not to execute this agreement." Interestingly, the separation agreement allows for agreement only, there is no designated area to mark or sign to indicate rejection. Because of the 21-day review period, the ability to accept the separation agreement expired on June 1, 1999. Plaintiff did not accept the agreement or send an explicit rejection until mid-June. Nevertheless, after the 21-day review period had elapsed, defendant did not issue plaintiff's stay pay bonus or contact plaintiff to confirm whether his silence or lack of acceptance indicated a rejection.

On June 18, 1999, defendant received a letter from plaintiff's attorney, asking that plaintiff's stay pay bonus be issued immediately. Instead of issuing plaintiff's stay pay bonus, defendant wrote back to plaintiff's attorney on June 22, 1999, stating that it was awaiting plaintiff's acceptance or rejection of the separation agreement before it would issue the stay pay bonus. On July 1, 1999, defendant received a letter from plaintiff's attorney explicitly rejecting the separation agreement on behalf of his client. On July 19, 1999, plaintiff received his stay pay bonus, approximately five weeks later than was required under the original stay pay bonus agreement.

■ The ADEA prohibits an employer from discriminating against an employee opposing an unlawful employment practice. *Brenner v. Brown*, 36 F.3d 18, 19 (7th Cir.1994). In order to prevail on a claim of retaliation, plaintiff must show that (1) plaintiff engaged in statutorily protected activity; (2) plaintiff suffered an adverse action; and (3) there is a causal link between the protected activity and the adverse action. *Brenner*, 36 F.3d at 19 (citing *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992)).

■ Plaintiff alleges that he suffered an adverse employment action because he had to jump through hoops (that is, retain legal counsel and submit two demands) in order to obtain his stay pay bonus. However, plaintiff does not allege that he rejected the separation agreement, either verbally or in writing, and that defendant withheld his stay pay bonus after his rejection. *Cf. Gaspar v. Linvatec Corp.*, 952 F.Supp. 1274, 1282 (N.D.Ill.1997) (affirmative denial of benefits after plaintiff affirmatively protested signing the release). Plaintiff did not need to jump through the hoops he described; he merely needed to reject the separation agreement. If defendant had withheld plaintiff's stay pay bonus after he rejected the separation agreement, that would be a different story. However, this is not the case.

Even if plaintiff suffered an adverse action through his silent rejection, plaintiff has not provided any causal connection between the protected activity (presumably, filing an ADEA lawsuit) and the alleged adverse action (withholding the stay pay bonus). In fact, in the June 18 letter, plaintiff's attorney was explicit that plaintiff was initiating a federal lawsuit for his wrongful termination. From the proposed facts, it appears that this is the first notification that plaintiff was instigating a federal lawsuit regarding his termination. Notwithstanding plaintiff's legal position, defendant wrote back to plaintiff, stating that it was awaiting plaintiff's rejection and that it would issue plaintiff's stay pay bonus promptly on receipt of that rejection, which it did. This is objectively reasonable. *See Hamner v. St. Vincent Hosp.*

*and Health Care Center, Inc.*, 224 F.3d 701, 707 (7th Cir.2000) (in retaliation claim, "plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable").

Because plaintiff has failed to meet his prima facie showing of retaliation, I will grant defendant's motion for summary judgment as to this claim.

## ORDER

IT IS ORDERED that

1. Defendant National Propane's motion for summary judgment is DENIED as to plaintiff Raymond A. Hamilton's age discrimination claim and is GRANTED as to plaintiff's retaliation claim; and

2. The clerk of court is directed to dismiss the complaint as to "David Bertelser."