Dorothy Elaine BEARLEY, Plaintiff,

v.

FRIENDLY ICE CREAM CORPORATION, Defendant.

No. CIV.A. 3:CV–02–1526.

United States District Court, M.D. Pennsylvania.

May 17, 2004.

Kimberly D. Borland, Borland & Borland, Wilkes–Barre, PA, for Plaintiff.

Elizabeth A. Maguschak, McNees Wallace & Nurick LLC, Hazleton, PA, for Defendant.

## MEMORANDUM

CAPUTO, District Judge.

Presently before the Court is Defendant Friendly Ice Cream Corporation's (hereinafter Friendly's) Motion for Summary Judgment. (Doc. 12.) Plaintiff Dorothy Bearley is alleging violations of the Family and Medical Leave Act, the Americans with Disabilities Act, and the Pennsylvania Human Relations Act. Friendly's motion will be granted with respect to the Family and Medical Leave Act, the Americans With Disabilities Act, and the Pennsylvania Human Relations Act. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. 1367.

## BACKGROUND

Plaintiff Dorothy Bearley worked twenty-two hours per week as a Bookkeeper for Friendly's restaurant in Dunmore, Pennsylvania. Ms. Bearley also worked as a Bookkeeper for eighteen hours per week for the District which encompassed the Dunmore restaurant. The positions together resulted in full-time employment. In addition, Ms. Bearley performed hostessing duties for one to two hours per week at the Dunmore restaurant. (Doc. 12, Ex. 8, ¶ 7.)

Dan Corbett was the General Manager of the Friendly's Dunmore restaurant and was Ms. Bearley's direct supervisor for her Dunmore restaurant responsibilities. Chuck Pashinski was the District Manager of the Dunmore restaurant, and six other Friendly's restaurants in Pennsylvania, including Muncy, Clarks Summit, Danville, Wilkes–Barre, Hazleton, and Dallas. Mr. Pashinski was Ms. Bearley's direct supervisor for the District bookkeeping job.

Ms. Bearley was responsible for the following tasks at the Dunmore restaurant:

- Prepare payroll
- Prepare payroll checks
- Prepare Tip Declaration Agreement
- Prepare Weekly Report to Restaurant Accounting
- Prepare accounts payable
- Prepare weekly payment activity report
- Track employee meals
- Record sales figures on OPF–21
- Write work schedules

Ms. Bearley's was responsible for the following tasks for the District:

- Collect daily sales report from restaurant managers in the District
- Collect weekly sales projections from restaurant managers in the District
- Prepare a report each Monday regarding the actual restaurant numbers
- Assist in preparation of managers schedules
- Perform miscellaneous correspondence and filing
- Check and file deposit tickets

Of the seven restaurants in Mr. Pashinski's district, only four restaurants had bookkeepers, and all performed the job on a part-time basis as of January, 2000. (Doc. 12, Ex. 7, ¶ 9.) The bookkeeping duties of the other three restaurants were performed by store management. (*Id.* at ¶ 10.)

Sometime in the first half of 2000, Friendly's district and general managers were informed that various bookkeeping functions were going to be automated. (*Id.* at ¶ 11–12.) The automation meant that there would be fewer responsibilities for Bookkeepers. (*Id.*) In Spring, 2000, Mr. Pashinski began discussing with general managers within his District the need

to reduce Bookkeeper's hours. (*Id.* at ¶ 14.) Indeed, Mr. Pashinski told the General Manager of the Danville restaurant that the fourteen hours of bookkeeping time was too high, and would be need to be lowered. (*Id.* at ¶ 14.) Also in late Spring of 2000, restaurant general managers were informed that Friendly's was adopting a new payroll automation system and that the general managers would be responsible for all payroll functions. (Doc. 12, Ex. 8, ¶ 12.) In June, 2000, Mr. Corbett was required to attend a training session to learn the new payroll automation system. (*Id.* at ¶ 12.) The automated payroll system was activated in July, 2000.

As a result of the automation, several of the restaurant bookkeeping duties became the responsibility of the General Managers. For example, payroll preparation, preparation of payroll checks, and the Tip Declaration Agreements became the responsibility of the General Managers. The tracking of employee meals was eliminated. Additionally, the Weekly Report to Restaurant Accounting became computerized. (*Id.* at ¶ 19.)

On July 5, 2000, Ms. Bearley informed Mr. Corbett that she was being hospitalized to have a toe removed due to a complications from diabetes. Ms. Bearley was granted leave. Prior to her request and being granted medical leave, Mr. Pashinski told Ms. Bearley that there would be some changes to her position. (Doc. 12, Ex. 1 at 47–8.) Also prior to taking leave, Ms. Bearley was aware that Mr. Pashinski received a laptop computer that was to be used to prepare reports and receive information from restaurant General Managers. (*Id.* at 76.) Because he was a novice with computers, Mr. Pashinski asked Helen Evanko, an employee at the Hazleton restaurant, to help him learn how to use the laptop. Prior to returning from medical leave, Ms. Bearley learned that aspects of her job were being automated. (*Id.* at 57–8.)

In late August, 2000, Ms. Bearley was released to return to work. On August 29, 2000, Messrs. Pashinski and Corbett met with Ms. Bearley to discuss her employment with Friendly's. At the meeting, Mr. Pashinski told Ms. Bearley that many bookkeeping duties were automated and were now the responsibility of either the restaurant General Manager or the District Manager. (Doc. 12, Ex. 7 at ¶ 39; Doc. 12, Ex. 1 at 65.) Because many of her bookkeeping responsibilities were automated and now managements responsibility, Ms. Bearley was offered twenty-two hours of bookkeeping duties; fifteen hours for the Dunmore restaurant and seven hours for the District. In addition, she was offered thirteen hours of food preparation, and three hours of hostessing per week. Mr. Pashinski offered Ms. Bearley a stool to sit on for both the food preparation and hostess positions.

During the August 29 meeting, Messrs. Pashinski and Corbett were aware that Ms. Bearley had diabetes and that she had a toe amputated, but they were not aware of her Charcot joint disease. At the end of the meeting, Ms. Bearley told her managers that she would need to think about the job offer. A few days later, Ms. Bearley left a voice mail message for both Messrs. Pashinski and Corbett telling them that she would not accept the position they had offered. Ms. Bearley then sent a letter to Mr. Pashinski reiterating her rejection of job offer. At no time did Ms. Bearley request any accommodation.

**STANDARD OF REVIEW**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its existence or non-existence might affect the outcome of the suit under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *See id.* at 248, 106 S.Ct. 2505. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

Where there is a material fact in dispute, the moving party has the initial burden of proving that (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *See White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *See Anderson,* 477 U.S. at 256–257, 106 S.Ct. 2505.

The court need not accept mere conclusory allegations or denials taken from the pleadings. *See Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## DISCUSSION

Friendly's has filed the present motion for summary judgment (Doc. 12) claiming that it was entitled to reduce Ms. Bearley bookkeeping hours while she was on medical leave. Ms. Bearley contends that Friendly's violated both the Family and Medical Leave Act and the Americans With Disabilities Act when it did not reinstate her to her previous Bookkeeper position or a substantially equivalent position upon her return from her medical leave.

### 1. Family and Medical Leave Act

Courts have recognized two distinct causes of action under the Family and Medical Leave Act (hereinafter FMLA). *Callison v. City of Philadelphia,* No. CIV. A. 03–3008, 2004 WL 765479, at *3 (E.D.Pa. Mar. 31, 2004). First, a plaintiff may pursue recovery under an "interference" theory. This claim arises under 29 U.S.C. § 2615(a)(1), which makes it unlawful for an employer "to interfere with, restrain, or deny" an employee's rights under the FMLA.[1] Under an interference

---

1. "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise

claim, it is plaintiff's burden to demonstrate that she was entitled to a benefit under the FMLA, but was denied that entitlement. *Id.* at *4; *Parker v. Hahnemann Univ. Hosp.*, 234 F.Supp.2d 478, 485 (D.N.J.2002). The FMLA entitles eligible employees to reinstatement at the end of their FMLA leave to the position held before taking leave or an equivalent position. *Hahnemann*, 234 F.Supp.2d at 489. If the plaintiff meets this burden, then it is defendant's burden to demonstrate that she would have been denied reinstatement even if she had not taken FMLA leave. *Id.*

■ The second type of recovery under the FMLA is the "retaliation" theory. This claim arises under 29 U.S.C. § 2615(a)(2), which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave.[2] *Callison*, 2004 WL 765479, at *4. Retaliation claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. *Callison*, 2004 WL 765479, at *4; *Ketchum v. Merck & Co., Inc.*, No. CIV. A. 02–540, 2003 WL 21497577, at *6 (E.D.Pa. June 30, 2003). To establish a prima facie case of retaliation under the FMLA, a plaintiff must show: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the adverse action and Plaintiff's exercise of her FMLA rights. *Callison*, 2004 WL 765479, at *4. After establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* If the

employer offers a legitimate, nondiscriminatory reason, the burden is shifted back to plaintiff to establish that the employer's reasons are pretextual. *Id.*

### a. Interference Theory

■ There is no dispute that Ms. Bearley was entitled to take medical leave and was granted such leave by Friendly's. Ms. Bearley asserts that when she was released to return to work, she was told by Messrs. Pashinski and Corbett that her full-time Bookkeeper position was no longer available. (Doc. 12, Ex. 7, ¶ 29.) As noted above, employees who take FMLA leave are entitled to the position they held before taking the leave or an equivalent position. *See* 29 U.S.C. § 2615(a)(1). This right to reinstatement is limited, however. The right to reinstatement does not entitle an employee to a right, benefit or position to which the employee would not "have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). "If an employee is discharged during or at the end of a protected leave for a reason unrelated to the leave, there is no right to reinstatement." *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 141 (3rd Cir.2004).

■ "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir.1998). An employee may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the

---

of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

2. "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

dismissal would have occurred regardless of the employee's request for or taking of FMLA leave. *Id.* With no absolute right to reinstatement, whether an employer violates the FMLA turns on why the employee was not reinstated. *See Kohls v. Beverly Enterprises Wisconsin, Inc.,* 259 F.3d 799, 805 (7th Cir.2001).

In the present case, Friendly's has presented evidence that the restaurants were undertaking a bookkeeping modernization process (Doc. 12, Ex. 7, ¶ 11–13), which would have resulted in the elimination of Ms. Bearley's full-time Bookkeeper position irrespective of whether she took medical leave. Mr. Pashinski, the District Manager, states in his affidavit that "[b]eginning in the year 2000 and continuing through 2001, Friendly's began to reduce and finally eliminate bookkeepers, both on the district level and on the restaurant level." (*Id.* at ¶ 11.) Mr. Pashinski advised the manager of the Danville restaurant that fourteen hours of bookkeeping hours per week was too much and would not be accepted in the future. (*Id.* at ¶ 14–15.)

In late spring through early summer of 2000, Mr. Corbett learned that Friendly's was adopting a new payroll automation system. (Doc. 12, Ex. 8, ¶ 12.) In June 2000, Mr. Corbett was required to attend a training session for managers to learn the new payroll automation system. (*Id.* at ¶ 13.) The new automated payroll system was went "live" in July, 2000, while Ms. Bearley was out on medical leave. (*Id.* at ¶ 16.) When Ms. Bearley returned from medical leave, the payroll preparation, check preparation, and Tip Declaration Agreement were automated and had became the responsibility of the restaurant General Managers. (Doc. 12, Ex. 8, ¶ 32.) The only aspects of Ms. Bearley's District bookkeeping responsibilities that remained after late summer, 2000, was preparation of miscellaneous correspondence, checking deposit tickets for restaurants, and filing. (Doc 12, Ex. 7, ¶ 26.) The lack of District bookkeeping tasks was a result of Mr. Pashinski getting a laptop computer and the process being automated via his computer. Additionally, Ms. Bearley acknowledges that there were no substantially equivalent positions to her Bookkeeper position. (Doc. 12, Ex. 1 at 49.)

Thus, the evidence supports Friendly's assertion that Ms. Bearley's full-time Bookkeeper position was going to be reduced irrespective of whether she took FMLA leave. Accordingly, I will grant Friendly's motion with respect to the interference theory.

**b. Retaliation Theory**

■ As noted above, to establish a prima facie case of retaliation under the FMLA, a plaintiff must show: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the adverse action and Plaintiff's exercise of her FMLA rights. Plaintiff has satisfied her burden of establishing a prima facie case. Ms. Bearley requested, and was granted, leave to remedy a medical condition with her foot. With respect to the adverse employment action, Friendly's concedes that Ms. Bearley was not returned to the full-time bookkeeping positions which she occupied prior to her medical leave. (Doc. 14 at 4.) Part of Ms. Bearley's bookkeeping position was eliminated while she was on FMLA leave, thus demonstrating a causal connection between taking medical leave and the adverse action.

■ The burden now shifts to Friendly's to articulate a legitimate, nondiscriminatory reason for its adverse employment action. Friendly's has successfully met its burden. Friendly's offers the same reason

here as it did under the interference theory discussed above. *See supra* Part 1(a). Friendly's asserts that it modernized its bookkeeping by automating many of the procedures. (Doc. 12, Ex. 7, ¶¶ 11–13.) Mr. Pashinski, the District Manager, states in his affidavit that "[b]eginning in the year 2000 and continuing through 2001, Friendly's began to reduce and finally eliminate bookkeepers, both on the district level and on the restaurant level." (*Id.* at ¶ 11.)

In late spring through early summer of 2000, Mr. Corbett learned that Friendly's was adopting a new payroll automation system. (Doc. 12, Ex. 8, ¶ 12.) In June 2000, Mr. Corbett was required to attend a training session for managers to learn the new system. (*Id.* at ¶ 13.) The new automated payroll system was activated in July, 2000, while Ms. Bearley was out on medical leave. (*Id.* at ¶ 16.) When Ms. Bearley returned from medical leave, the payroll preparation, check preparation, and tip declaration agreement were automated and became the responsibility of the restaurant General Managers. (Doc. 12, Ex. 8, ¶ 32.) Ms. Bearley was not offered a substantially equivalent position because none existed. (Doc. 12, Ex. 7, ¶ 43.) Ms. Bearley agreed that there was a lack of substantially equivalent positions. (Doc. 12, Ex. 1 at 49.)

Friendly's has offered a legitimate, nondiscriminatory reason for not returning Ms. Bearley to her bookkeeping position or an equivalent position upon her return from FMLA leave. Now the burden is shifted back to Ms. Bearley to establish that Friendly's reason is pretextual. Ms. Bearley can carry her burden "by either (i) discrediting the [employer's] proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).

Ms. Bearley raised several issues with respect to pretext. First, Ms. Bearley points to the lack of written evidence documenting either the elimination of her District bookkeeping position or a reduction in hours. (Doc. 18, Ex. E at 110.) Second, Ms. Bearley contends that Mr. Pashinski did not reveal to anyone that he planned to eliminate her District bookkeeping position. (*Id.* at 119–20.) Third, Ms. Bearley argues that Mr. Pashinski admitted that Friendly's had no set deadline for the elimination of restaurant Bookkeepers, although the time frame was one year from the first announcement of automation. (*Id.* at 84–85.) Fourth, Ms. Bearley notes that the three other Bookkeepers within Mr. Pashinski's District did not have their bookkeeping hours reduced during her medical leave from July 5, 2000, through August, 29, 2000.

With respect to the other three bookkeepers in Mr. Pashinski's District, it appears that all three bookkeepers performed some bookkeeping duties after Ms. Bearley's FMLA leave ended. For example, in June, 2000, Sheila Haigh performed approximately fourteen hours per week of bookkeeping duties. (Doc. 12, Ex. 7 at ¶ 12.) However, by late 2000 and into 2001, Ms. Haigh was performing five hours per week of bookkeeping. (Doc. 12, Ex. 7 at ¶ 62.) While Diane Miller is no longer doing bookkeeper functions for the Danville restaurant, she now does seven hours per week of bookkeeping duties for the District. (*Id.* at ¶ 59.)

Helen Evanko was also a bookkeeper for Friendly's. Ms. Evanko states that from July, 2000, until February, 2002, her hours actually worked as a bookkeeper were never reduced. (Doc. 17. Ex. B at ¶ 7.) Starting in the fall of 2000 and continuing

through 2001, Ms. Evanko worked as a bookkeeper for the Hazleton restaurant, Mr. Pashinski's District, and for Pete Jurta's District. (Doc. 20, part 3 at ¶ 14–15.) Collectively, this amounted to full-time work. (*Id.*)

Ms. Bearley has not produced sufficient evidence to raise a genuine issue of fact as to whether Friendly's proffered reasons were not its true reasons for not reinstating her to her full-time bookkeeping position. Ms. Bearley has not challenged any part of Friendly's assertion that it was undergoing an automation process before, during, and after she was on FMLA leave. Nor has Ms. Bearley challenged Friendly's claim that the restaurant General Manager and District Manager became directly responsible for many of the bookkeeping functions that Ms. Bearley formerly performed. While Friendly's did employ other bookkeepers, only one within Mr. Pashinski's District had full-time hours. However, she was splitting her time between three bookkeeping jobs. Because Ms. Bearley has failed to demonstrate that Friendly's reason for not returning her to her bookkeeping position was pretextual, I will grant Friendly's motion for summary judgment with respect to the FMLA retaliation theory.

## 2. Americans with Disabilities Act

■ As a preliminary matter, the analysis for an Americans with Disabilities Act (hereinafter ADA) claim applies equally to Pennsylvania Human Relations Act (hereinafter PHRA) claims. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir.1996). The analytical burden-shifting framework of *McDonnell Douglas* utilized for the FMLA retaliation analysis also applies to ADA discrimination claims. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir.2000); *Walton v. Mental Health Ass'n. of Southeastern Pennsylvania*, 168 F.3d 661, 668

(3d Cir.1999). Therefore, to establish her ADA and PHRA claims, Plaintiff has the burden of first establishing a prima facie case of discrimination by showing: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir.1998).

If the employee successfully establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). If the employer can articulate such a reason, the burden shifts back to the employee, who must produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment actions." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir.1996).

### a. Prima Facie Case

■ Friendly's asserts that Ms. Bearley is unable to present a prima facie case of discrimination because she has a heightened burden as a result of being "terminated as part of a reduction in force." (Doc. 14 at 19.) While not deciding whether this is a correct statement of law, the facts of this case do not bear out Friendly's position that this is a reduction in force (hereinafter RIF) case. The Court is unable to locate a definition of what constitutes a RIF in the Third Circuit. Therefore, I will look to other circuits for guidance.

The Seventh Circuit Court of Appeals has stated that a "RIF takes place when an employer decides to eliminate certain positions from its workforce." *Bellaver v.*

*Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). A RIF typically involves the layoff of many employees at once. *Id.* The Sixth Circuit Court of Appeals defined a RIF as:

A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990). Based on these definitions, a RIF occurs when a business decides to totally eliminate one or more positions. This did not occur in the present case. When Ms. Bearley returned from FMLA leave, Messrs. Pashinski and Corbett offered her twenty-two of her original forty hours per week of bookkeeping work. While the evidence shows that Friendly's was undergoing an automation of its bookkeeping and subsequently reduced Ms. Bearley's bookkeeping hours, her position was not eliminated upon her return. Therefore, this case does not involve a RIF, and I will apply the standard *McDonnell Douglas* analysis.

### 1. Disabled Within the Meaning of the ADA

■ Ms. Bearley is disabled within the meaning of the ADA since she has a physical impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g). There are three ways in which a person can be classified as disabled: (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment.[3] *See* 42 U.S.C.A. § 12102(2). In this case, Ms. Bearley had a toe amputated, and she suffers from Charcot joint disease. (Doc. 17, Ex. A.) In her affidavit, Ms. Bearley stated that she is unable to walk more than 100 feet without stopping to rest. (*Id.*) She also states that she is unable to stand for more than sixty seconds without sitting. (*Id.*)

Although neither "major life activities," nor "substantially limited" is defined by statute, EEOC regulations provide guidance. According to 29 C.F.R. § 1630.2(i), walking is specifically listed as a major life activity. Standing is also recognized as a major life activity. *See Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 185 (3d Cir.1999) (holding that walking and standing are major life activities); *see also Buskirk v. Apollo Metals*, 116 F.Supp.2d 591, 598 (E.D.Pa.2000) (finding that walking and standing are major life activities). The United States Supreme Court has said that major life activities "refers to those activities that are of central importance to daily life." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

A person is substantially limited when she is "[u]nable to perform a major life activity that the average person in the general population can perform; or is significantly restricted as to the condition,

---

3. In her Complaint, Plaintiff says that she has a record of disability and was regarded as disabled. Friendly's addressed both issues in its brief in support, but Plaintiff failed to even mention either issue in its brief in opposition. Because Plaintiff never addressed either issue in her brief, I will deem those issues waived.

manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). Because Ms. Bearley is substantially limited in her ability to walk and stand, a reasonable jury could find that she is disabled within the meaning of the ADA.

## 2. Qualified Individual

■ The second prong of the prima facie case is whether Ms. Bearley is otherwise qualified to perform the essential functions of the job. Neither side disputed that Ms. Bearley is qualified to perform the essential functions of Bookkeeper. With respect to the food preparation and hostess positions, Plaintiff presents no direct evidence establishing that she is qualified to perform the essential functions of either job. However, Friendly's did offer Ms. Bearley the positions of food preparation and hostess, which allows one to infer that Friendly's believed that she was qualified to perform the essential functions of both jobs. Moreover, Ms. Bearley served as a hostess one to two times per week prior to taking medical leave (Doc. 17, Ex. D at 20) and has been employed at Friendly's and its predecessor since 1978. (Doc. 18, Ex. C at 10–12.)

## 3. Adverse Employment Action

■ The third prong of the prima facie case requires Ms. Bearley to demonstrate that she has suffered an otherwise adverse employment decision as a result of discrimination. Discrimination under the ADA comes in two forms: (1) subjecting the employee to an adverse employment action motivated by prejudice or fear; or (2) failing to provide a reasonable accommodation for a disability. *Taylor v. Phoe-*

*nixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999). Ms. Bearley is alleging both types of discrimination.

### i. Failure to Accommodate

■ The ADA requires that an employer provide accommodations to the employee when requested, unless the requested accommodation would create an undue hardship for the employer. 42 U.S.C. § 12112(b)(5)(A). Reasonable accommodations include "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). *See Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir.1997) (both employer and employee has duty to participate in interactive process); *see also Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 330 n. 13 (3d. Cir.2003) (applying *Mengine* to ADA case).

Ms. Bearley has failed to establish that there was a failure to accommodate. The undisputed facts show that at the August 29, 2000, meeting between Ms. Bearley and Messrs. Pashinski and Corbett, Ms. Bearley was offered twenty-two hours of bookkeeping, thirteen hours of food preparation, and three hours of hostessing per week. (Doc. 12, Ex. 7, ¶ 32.) At this meeting, Mr. Pashinski offered Ms. Bear-

ley a stool to sit on while performing food preparation and hostessing duties to accommodate her difficulties in standing. (Doc. 12, Ex. 1 at 66–67; Doc. 12, Ex. 7, ¶ 37.) The August 29, 2000, meeting ended with Ms. Bearley telling Mr. Pashinski that she would need to think about the job offer. (Doc. 12, Ex. 7, ¶ 40.) Shortly after the meeting, Ms. Bearley left a voice mail message for Messrs. Pashinski and Corbett saying that she would not accept the position they had offered. (Doc. 12, Ex. 7, ¶ 41; Ex. 8, ¶ 54.) Ms. Bearley then sent a letter to Mr. Pashinski stating that if she could not return to her full-time bookkeeping position, she would not accept the position she was offered. (Doc. 12, Ex. 7, ¶ 42.)

Ms. Bearley did not engage in the interactive process, and, therefore, is unable to demonstrate a prima facie case of failure to accommodate. The Third Circuit Court of Appeals has made clear that both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith. *See Conneen,* 334 F.3d at 330. That did not happen in this case. Ms. Bearley presented no evidence showing that she engaged in the interactive process. She rejected an offer of employment that included an accommodation, namely, a place to sit while working. After this offer, Ms. Bearley did not engage in any interactive process to resolve the situation. Indeed, Ms. Bearley was satisfied with the accommodation she was offered. In Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgement (Doc. 16), Plaintiff says "Ms. Bearley does not argue that Friendly's should have provided her with better accommodations to enable her to perform the food prep job or the hostess job." (Doc. 16 at 15.) Therefore, Ms. Bearley is unable to demonstrate a failure to accommodate.

### ii. Adverse Employment Action

 An adverse employment action is one in which a reasonable person could find that the employment was substantially worsened. *Dilenno v. Goodwill Indus. of Mid–Eastern Pa.,* 162 F.3d 235, 236 (3d Cir.1998). "It is important to take a plaintiff's job-related attributes into account when determining whether a lateral transfer was an adverse employment action." *Id.* "The facts that her pay and benefits were not reduced and that [the employer] considered the jobs equivalent are not dispositive [as to whether an employment action is adverse]." *Id.* A transfer to a dead-end job can constitute an adverse employment action. *Torre v. Casio, Inc.,* 42 F.3d 825, 831 (3d Cir.1994). Constructive discharge can constitute an adverse employment action. *See Suders v. Easton,* 325 F.3d 432, 447 (3d Cir.2003). A person is constructively discharged when an employer "permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 167 (3d Cir.2001) (citing *Spangle v. Valley Forge Sewer Auth.,* 839 F.2d 171, 173 (3d Cir.1988)). An alteration in job responsibilities can rise to the level of constructive discharge. *Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3d Cir.1993) (citing *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1082 (3d Cir.1992) and *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 888–89 (3d Cir.1984)).

 Both the reduction in Bookkeeper hours and the change to food preparation could reasonably be considered an adverse employment action. Prior to taking medical leave, Ms. Bearley was a ·full-time Bookkeeper and also served as hostess for a few hours per week. (Doc. 12, Ex. 8, ¶ 7.) There is no evidence that Ms. Bearley had previously worked in Friendly's kitch-

en. A food preparation position will likely involve different working conditions, status, skill, and authority than a bookkeeping position. Therefore, a reasonable jury could find that Ms. Bearley's employment was substantially worsened by having her bookkeeping hours reduced and given a food preparation position.

### b. Legitimate, Nondiscriminatory Reason

Friendly's has the burden to offer a legitimate, nondiscriminatory reason for the adverse employment action. The same reason offered under the FMLA retaliation section is applicable here. *See supra* Part 1(b). Friendly's was undertaking an automation process, and as a result, did not have full-time bookkeeping work available for Ms. Bearley. Friendly's has met its burden.

### c. Pretext

Friendly's has offered a legitimate, nondiscriminatory reason for its adverse employment action. Now the burden is shifted back to Ms. Bearley to establish that Friendly's reason is pretextual, that is, the offered reason was not its true reason for its actions. Ms. Bearley has failed to meet her burden. As discussed in the FMLA retaliation claim, Ms. Bearley has not challenged any part of Friendly's assertion that it was undergoing an automation process before, during, and after she was on FMLA leave. Nor has Ms. Bearley challenged that the restaurant General Manager and District Manager became directly responsible for many of the bookkeeping functions that Ms. Bearley formerly performed. There is also a lack of evidence offered by Ms. Bearley that suggests that Mr. Pashinski's statement that he did not have any desk jobs available for her is untrue. Ms. Bearley acknowledged that no substantially equivalent positions existed. Because Ms. Bearley has failed to demonstrate how Friendly's reason for not returning her to her bookkeeping position was pretextual, and, therefore, has not raised a genuine issue of material fact, I will grant Friendly's motion for summary judgment with respect to the ADA and PHRA claims.

### CONCLUSION

Friendly's motion is granted as to all claims.

An appropriate Order will follow.

### ORDER

**NOW**, this 17th day of May, 2004, **IT IS HEREBY ORDERED THAT** Defendant Friendly Ice Cream Corporation's Motion for Summary Judgment (Doc. 12) is **GRANTED.** The Clerk of the Court shall mark this case closed.