Elizabeth C.O. **BELLAVER,**
Plaintiff–Appellant,

v.

QUANEX **CORP./Nichols–Homeshield,**
Defendant–Appellee.

No. 98–3708.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1999

Decided Jan. 18, 2000

488

Carmen D. Caruso (argued), Chicago, IL, for Plaintiff–Appellant.

Michael R. Lied (argued), Howard & Howard, Peoria, IL, for Defendant–Appellee.

Before KANNE, DIANE P. WOOD and EVANS, Circuit Judges.

KANNE, Circuit Judge.

Elizabeth Bellaver's departure from her employer of twenty years, the Quanex Corp. of Houston, Texas, came at a time of significant reorganization for the company. Ordinarily, economic downturns and shakeups provide an employer great latitude in making personnel decisions. However, Congress refuses to afford an employer at any time—economically fortuitous or economically disastrous—the right to discriminate on the basis of sex, which is the question at the heart of this complaint.

After being discharged by Quanex, Bellaver sued under Title VII of the Civil Rights Act ("Act"), claiming that she was fired because her employer disapproved of her aggressive and sometimes abrasive style while permitting the same characteristics in male employees. Quanex contends that Bellaver was the victim of an economic reorganization that had more to do with her position than her person. On that theory, the district court granted Quanex summary judgment. We review the district court's decision de novo and reverse.

## I. HISTORY

### A. Quanex Corp.

The defendant in this case, Quanex Corp., is a Houston-based company engaged in the manufacture of metal products with offices and facilities in several states. In 1989, it acquired Nichols-Homeshield, Inc., and its Homeshield Fabricated Products Division ("HFP"). Nichols–Homeshield specialized in the production of a wide variety of aluminum products, while HFP focused on products for home remodeling. HFP had administrative offices near St. Charles, Illinois, and a production facility 100 miles away in Chatsworth, Illinois. In 1997, Quanex merged HFP with AMSCO, another division which specialized in products used in the manufacture and installation of windows.

During the various acquisitions and mergers, Quanex, like many modern companies, found it fiscally beneficial to eliminate and consolidate positions and layoff some employees. Specifically, the restructuring meant the closing of a Nichols–Homeshield office in Illinois and the transfer or consolidation of those jobs to Texas. In 1991 and 1992, six Nichols employees were laid off, but never more than one in any month. Quanex attributed these layoffs to the restructuring and called them "reductions in force" ("RIFs"), a term of art in employment law meaning the positions were eliminated and the employees not replaced. In March 1993, another employee was laid off, but in April 1993, the sporadic restructuring became a full-fledged wave of pink slips when ten employees were terminated. The second wave hit the next month when five employees were let go. Both of these waves of layoffs also were characterized as RIFs.

In 1994, no one from the Nichols operation was laid off; and in 1995 and 1996, only one employee was laid off each year. On March 18, 1997, Quanex laid off Elizabeth C.O. Bellaver, HFP's business development manager, in what Quanex characterized as a one-person reduction-in-force.

### B. Elizabeth C.O. Bellaver

Bellaver began work as an Ohio-based "field sales representative" for Nichols–Homeshield in 1977, covering a territory that spanned seven states plus Ontario, Canada. In 1983, she received a master's in business administration from Kent State University, and in 1985, she moved with her family to St. Charles where she became a marketing manager for Nichols-Homeshield. Her responsibilities in the new position greatly exceeded her former duties in sales and included marketing research, distribution, economic forecasting, advertising, promotions and planning. In 1988, the company promoted her to "Product Manager, Engineered Products" in the HFP division with responsibility for five product lines. In 1992, Bellaver was pro-moted again, this time to "Product Manager" in charge of twelve product lines. In this position, she reported to Michael Penny, the vice president and general manager of the HFP division.

In 1995, the possibility arose that the product manager position for HFP would be transferred from St. Charles to Chatsworth. Bellaver told Penny she would be willing to commute to keep the job, but according to Bellaver's testimony, Penny responded that "it would not work well for [Bellaver and her] family." Another employee, a man named Doug Seanor, also talked to Penny about commuting for the job. Seanor, who lived with his family near St. Charles in Geneva, Illinois, testified that Penny indicated that he could have the job if he wanted it, and commuting was not a problem so long as he was at work from 8:00 a.m. to 5:00 p.m. Penny denied Seanor's version of events and said he did not offer the job to Seanor. Penny claimed he expressed the same concern about Seanor commuting as he did Bellaver. A second woman from outside the company also interviewed for the job but was rejected in favor of a male employee who already worked at the Chatsworth facility.

In February 1996, Bellaver was promoted to "business development manager" in HFP, a position in which she would prepare market research, identify growth opportunities and direct new sales efforts. This assignment included responsibility for the HMI project, a plan to sell HFP products to small clients at premium prices. The company hoped the new HMI initiative would turn a profit by October 1997, although apparently it did not meet its goals in 1996 and was still performing below expectations in early 1997. She served in this position at a salary of $79,398 until she was fired in April 1997.

### C. Bellaver's Evaluations

Bellaver consistently scored in the high or highest ranges on her annual employee evaluations, with many marks of "out-

standing," "excellent" and "exceeds expectations," including reviews conducted by Penny. She was frequently praised for her intelligence, ability, attitude and understanding of her responsibilities, the market and the company's products. In 1996, Penny noted that Bellaver's "[p]roblem solving [and] decision making skills leave nothing to be desired." In that year, she completed a market study that Penny called "thorough and contains opportunities to grow our business." Other aspects of her performance likewise received marks of outstanding or "exceeds expectations."

Alongside the high praise Penny gave to Bellaver in her annual reviews ran a continuous strain of displeasure at her personal skills. In 1993, while calling her a "bright and talented employee" with "excellent judgment," Penny noted that "Elizabeth is making progress in her interpersonal skills. In dealing with others, she is continuing to be direct and demanding but less offensive." In 1994, Penny wrote, "Elizabeth is working to improve her interpersonal issues that cause, or at least impact, team performance that needs improvement." In that review, Penny listed as a goal for Bellaver to "heighten awareness of behavior issue." Her behavior and style also were noted as problems in 1995 and 1996.

The evaluations do not provide concrete examples of Bellaver's behavior or style upon which Penny's evaluations were based. However, an earlier evaluation, this one from 1984 and also conducted by a male supervisor, focused on Bellaver's difficulty in dealing with subordinate employees. That evaluation noted that she was "[a] poor listener. Not too tolerant of the less than very bright. Does not always allow two-way communications. Insensitive often to current social environment."

In deposition testimony, Penny reported that employee complaints alerted him to Bellaver's interpersonal problem. Penny cited two employees, Ron Arbizzani and Doug Breen, who had complained about Bellaver. Both employees also had problems with interpersonal communication. On one occasion, Breen lost his temper at a meeting of several managers. However, the employee evaluations of Breen and Arbizzani did not contain the same type of criticism as Bellaver's reviews.

### D. Patricia Shaw

Patricia Shaw, the human resources manager for Nichols–Homeshield who had been terminated in 1992 due to an alleged reduction in force, testified that she spoke to Penny several times about Bellaver. Shaw believed Bellaver was a good employee and repeatedly told Penny that male engineers at the company viewed a woman's assertive behavior negatively. That attitude reflected a double standard, in Shaw's view, because the same trait was viewed positively in men. Shaw testified that the engineers treated Bellaver "unfairly as a woman" and that the company's "good ol' boy" network attempted to keep women out of the male-dominated world.

Still, Shaw believed Penny shared her view and treated Bellaver fairly and equally. Shaw further believed Penny considered assertiveness a positive trait in female managers. Shaw investigated two complaints about Bellaver and concluded that Bellaver had "gone somewhat overboard" in dealing with co-workers. Shaw characterized the difficulty as a communication problem with co-workers who disapproved of her manner and authority in issuing orders.

At the time of Shaw's discharge in 1992, Quanex referred to the decision to terminate her employment as a "reduction in force." Shaw, however, was replaced by a male and the real reason for Shaw's termination appears to involve the company's labor trouble at the time. Quanex admitted in its brief that "[p]erhaps Quanex's calling Shaw's termination a RIF was not accurate ... However, it is hardly unusual or discriminatory that an employer may

offer a face saving explanation to an employee being terminated."

### E. Bellaver's Termination

In 1996 or early 1997, Penny consulted with Sam Lewis, Quanex's human resources manager, about whether he could fire Bellaver because of her interpersonal skills. Penny said he "was tired of continually mopping up the blood after her interactions with people at the plant." The complaints from Arbizzani and Breen played a role in Penny seeking guidance on how to fire Bellaver, but Lewis reviewed Bellaver's file and advised against firing her because there was insufficient documentation to justify her termination. Although Bellaver was an at-will employee, Lewis felt better documentation was needed to avoid a lawsuit.

Shortly later, Quanex decided to merge its AMSCO and HFP divisions, and Jim Gulliford was placed in charge of Penny as the new vice president and general manager. In April 1997, Gulliford talked to Penny about firing Bellaver and asked if Penny would be able to handle Bellaver's workload. Penny said that he could cover Bellaver's workload or that of the national sales manager, Bruce Hucker, but not both. Penny testified that he talked with Gulliford about six times in 1996 and 1997 about Bellaver's problem getting along with others, although Gulliford said this did not factor into his decision to fire her. While the company admitted that Penny "played a role in determining to eliminate Bellaver's position," it asserts that Gulliford and Vice President for Human Resources Joe Peery were the "primary decision makers."

After Bellaver's departure on April 18, 1997, her former duties were taken over by Penny and Hucker, both on a part-time basis, and two full-time telemarketing specialists. Bellaver timely filed a complaint with the Equal Employment Opportunity Commission. She received a right-to-sue letter and filed this complaint.

After completing discovery, Quanex moved for summary judgment. The district court held that Bellaver failed to establish a *prima facie* case of sex discrimination under the standard for reduction in force cases because she could not point to a "similarly situated" employee outside of a protected class who was treated more favorably. Second, the district court found that Bellaver failed to produce sufficient evidence that Quanex fired her because of her sex. The court granted the motion for summary judgment on October 15, 1998. This appeal followed.

### II. ANALYSIS

Bellaver challenges the court's grant of summary judgment on two principal grounds. First, she argues that the district court applied the wrong standard for a *prima facie* case of employment discrimination. Second, she challenges the district court's finding that the evidence, even when weighed in her favor, failed to show a material question of fact.

■■ We review the district court's grant of summary judgment *de novo*, drawing conclusions of law and fact from the record before us. *See Haefling v. United Parcel Serv.*, 169 F.3d 494, 497 (7th Cir.1999). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We apply the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 240 (7th Cir. 1996); *Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir.1995).

■■ In determining whether a genuine issue of material fact exists, we must construe all facts in the light most favor-

able to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Neither "the mere existence of *some* alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat a motion for summary judgment. A genuine issue of fact "exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir.1999) (citation omitted).

### A. Mixed–Motive Discrimination

■ Title VII makes it "an unlawful employment practice for any employer ... to discharge any individual, or to otherwise discriminate against any individual ... because of such individual's ... sex." 42 U.S.C. § 2000e–2(a). An employee may attempt to prove unlawful discrimination in two principal ways: by providing evidence of discriminatory intent, or by what has become known as burden shifting. The facts of this case lend themselves to both theories, and Bellaver has argued both.

■ Under the first approach, a plaintiff may present direct or circumstantial evidence that the employment decision was motivated by the employer's discriminatory animus. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Geier*, 99 F.3d at 241. The 1991 amendments to the Act clarified that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). When the employee has presented evidence that the employer was motivated in part by dis-

crimination, the defendant may then avoid a finding of liability by proving that it would have made the same decision absent discrimination. *See Price Waterhouse*, 490 U.S. at 245, 109 S.Ct. 1775; *Troupe v. May Department Stores Co.*, 20 F.3d 734 (7th Cir.1994).

*Price Waterhouse* involved an accounting firm's decision not to offer partnership to a woman at least in part based on an "impermissibly cabined view of the proper behavior of women, and that Price Waterhouse had done nothing to disavow reliance on such comments." *Price Waterhouse*, 490 U.S. at 236–37, 109 S.Ct. 1775. Ann Hopkins, the plaintiff, had been praised as an "outstanding professional" and a "highly competent project leader" who was "extremely competent, intelligent." *Id.* at 234. However, her "interpersonal skills" were sharply criticized, particularly in the acerbic way she dealt with staff members. *Id.* at 234–35.

■ The parallel to the comments—both positive and negative—in Bellaver's personnel file is unmistakable. While it is permissible to evaluate an employee's interpersonal skills when those skills are relevant to the job, evaluations may demonstrate discriminatory intent when employees are evaluated on how their interpersonal skills match stereotyped, unequal ideas of how men and women should behave. For instance, Ann Hopkins was described as "macho" and told to "walk more femininely"—personality traits that are inherently gendered. The evidence against Quanex is not nearly so striking, but seen in the light most favorable to Bellaver, there could be evidence of discriminatory intent.

■ As in *Price Waterhouse*, the evidence suggests the employer here may have relied on impermissible stereotypes of how women should behave. Bellaver's evaluations are marred only by the repeated references to her interpersonal skills, but these same types of deficiencies seemed to be tolerated in male employees.

Penny knew of the sexist double-standard, knew that men resented working with Bellaver because she was a woman and knew that the company had a reputation as a "good ol' boy" network. Penny sought Bellaver's firing in late 1996 or early 1997 because of her social skills, or lack thereof. The human resources manager, Sam Lewis, reviewed Bellaver's file and told Penny that he did not have cause to fire her based on her interpersonal skills. Within a few weeks, Penny asked Bellaver to consider leaving the company voluntarily to work as an independent contractor, but the idea was rejected because, Bellaver contends, Penny withdrew the offer. Then, shortly afterward, Penny and Gulliford decided to fire Bellaver and have Penny, Hucker and others absorb her duties. A jury reasonably could find that this decision was motivated at least in part by the double-standard applied to men and women because only Bellaver and not Breen, Arbizzani or Gulliford, was criticized for being hard to get along with.

In the context of direct and circumstantial evidence of discrimination, we have said that a long time period between a remark and an employment action can defeat the inference of a "causal nexus between the remark and the decision to discharge." *Geier*, 99 F.3d at 242 (discounting evidence of bad intent that occurred a full year before the job action). But here, when the evidence of Penny's motive came within three or four months of the decision to discharge her, a jury could view the discharge as the culmination of·a continuous attempt to get rid of Bellaver.

■ Bellaver's argument that the trial court also should have considered events from 1992 and 1995 as evidence of intent is unpersuasive for this same reason. We do not credit the comment regarding Bellaver's family life in 1995 or the firing of Patricia Shaw in 1992 as evidence of impermissible motivation for terminating Bellaver in 1997. As we said in *Geier*, "to be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." 99 F.3d at 242. These two instances provide little if any insight into the decision to fire Bellaver in 1997.

*B. Reduction In Force*

■ The second approach to proving a violation of the Act requires the plaintiff to make out a *prima facie* case of discrimination, but then shifts the burden of producing evidence of a legitimate nondiscriminatory reason for the questioned employment action to the defendant. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case, the plaintiff must show that she was 1) a member of a protected class, 2) qualified for her position, 3) not chosen for the position and 4) that position remained open after she was rejected. *See id.* at 802, 93 S.Ct. 1817. The plaintiff's evidence on the *prima facie* case need not be overwhelming or even destined to prevail; rather, the plaintiff need present only "some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion." *Leffel v. Valley Financial Servs.*, 113 F.3d 787, 793 (7th Cir.1997).

■ If the plaintiff carries this low burden, the defendant must produce evidence of the non-discriminatory reason. The presumption of discrimination established by the *prima facie* case then dissolves, at which point the plaintiff has an opportunity to prove that the proffered nondiscriminatory reason was pretextual. *See id.* at 792. However, the ultimate burden of persuading the trier of fact that discriminatory animus caused her dismissal rests at all times with the plaintiff. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1032 (7th Cir.1998).

Recognizing that these burdens should not be applied rigidly, we have adapted them in special cases to reflect more fairly and accurately the underlying reality of the workplace. In a case involving a reduction in force ("RIF"), it would make no sense to require a plaintiff to show the position from which she had been terminated "remained open," as required by *McDonnell Douglas*. Rather, a *prima facie* case requires the employee show (in addition to the first two elements of the *McDonnell Douglas* claim) that she was discharged and that other, similarly situated employees who were not members of the plaintiff's protected class were treated more favorably. *See McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1166 (7th Cir.1997); *Smith v. Cook County*, 74 F.3d 829, 831 (7th Cir.1996). Under the *McDonnell Douglas* framework, this showing would tend to prove that the employer carried out the RIF in a discriminatory way.

The trial court found that Bellaver could not carry this burden because she could not point to any similarly situated employees, let alone any who were treated more favorably. In the typical hierarchical structure of corporate management, there often are not multiple people filling the same job description, and such a showing often can be difficult. This is not to say that such a showing could not be made at the management level, since managerial duties can be rearranged and redistributed among several managers, including those with different titles. For example, the facts of this case make it clear that Hucker, Penny, Breen, Bellaver and perhaps others had the ability to perform each other's tasks, even though they had different titles and specific responsibilities. Hucker's or Penny's duties could have been redistributed perhaps as easily as Bellaver's. An employer cannot frustrate the statute merely by assigning every employee a different job title or different number of "Hay Points." *See Wichmann v. Board of Trustees of Southern Ill. Univ.*, 180 F.3d 791, 803 (7th Cir.1999)

("[A]n employer cannot avoid liability for intentional discrimination by the 'simple expedient' of changing job titles.").

Bellaver's inability to make this showing, however, can be further explained by the mischaracterization of her termination as a reduction in force. A RIF takes place when an employer decides to eliminate certain positions from its workforce. RIFs typically involve the layoff of many employees at once, and employers will not be allowed cynically to avoid liability by terming a decision to fire an employee with a unique job description as a "RIF" when the decision in fact was nothing more than a decision to fire that particular employee.

Quanex's actions in this regard are troubling. Quanex admits to manipulating the use of the term RIF in the past as a pretense for terminating Patricia Shaw when its true motivation was to get rid of a manager who had become a symbol of dissatisfaction among the company's unionized workers. In its brief, Quanex confesses that "[p]erhaps Quanex's calling Shaw's termination a RIF was not accurate. However, there is no question Bellaver's position really was eliminated." One can hear more than a faint echo of "Wolf!" in this protestation.

Bellaver's duties were not really eliminated at all; they merely were redistributed among male employees. The prototypical RIF involves a company that perhaps once employed 100 engineers, but because of a business slow down or change in product lines, now needs only twenty engineers. The rest of the positions are eliminated, not absorbed. There does not seem to be a serious suggestion that Quanex no longer needed someone to market the HFP line. Rather, the company asked two male employees and two telemarketers to pickup Bellaver's duties. Whether this ultimately resulted in a savings compared to Bellaver's $76,000 salary is unclear.

■ The trial court concluded that Bellaver failed to produce evidence that similarly situated male employees were treated more favorably, but that finding is fatal only if the case is treated as a RIF. We do not believe that was the appropriate analysis here, where only one employee was terminated. Rather, we have held that the inference of discrimination arises in single-discharge cases, sometimes called "mini-RIFs," where the terminated employee's duties are absorbed by other employees not in the protected class. *See Wichmann*, 180 F.3d at 802; *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1331–32 (7th Cir.1995). The plaintiff in a single-discharge case does not need to make a showing that "similarly situated" employees were treated better because the inference of discrimination arises from the fact that they were constructively "replaced" by workers outside of the protected class. The point of the mini-RIF, unlike a true RIF, is that the job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively "replaced," not eliminated.

In *Wichmann*, we upheld a jury finding of discrimination for a 48–year–old employee who was fired when the position of "associate director" was eliminated. The university termed the decision a RIF. Although Wichmann's position was not re-filled, his duties were absorbed mostly by younger workers who retained their jobs during a departmental restructuring and in many cases received raises. Evidence in that case showed that job titles were meaningless, and the fact that Wichmann's duties were absorbed by employees occupying different rungs in the hierarchy did not preclude a finding of discrimination, since the "similarly situated" element was not required.

In contrast, the plaintiff in *Gadsby* lost his job as a Chicago area sales representative for a furniture company, but his position was neither replaced nor absorbed. We held that in such a scenario, there could be no inference of discrimination from evidence that younger employees were treated more favorably because it did not appear that the employer "selected the plaintiff for termination based on age from a group of employees who were equally qualified." *Gadsby*, 71 F.3d at 1331.

The critical question is whether male employees were treated more favorably than Bellaver, "which is the appropriate standard whether we regard [Bellaver's] termination as a reduction in force, ... or as a case 'where one employee is discharged and his responsibilities are absorbed by other employees, which essentially makes the single discharge a mini-RIF.'" *Wichmann*, 180 F.3d at 802 (internal citations and quotations omitted). It appears from the facts of this case that there is a genuine question of whether male employees were treated better than Bellaver. As noted above, a jury could find that Penny's antagonism toward Bellaver resulted from a double-standard applied to men and women at Quanex, which led to her termination. Of course, Quanex is free to present evidence that it would have fired Bellaver in the absence of discrimination, but whether to believe that story or Bellaver's is a credibility determination best left in the hands of a jury. Bellaver has cleared the hurdle required to survive summary judgment.

### III. CONCLUSION

Elizabeth Bellaver presented evidence sufficient to raise a material question of fact regarding whether Quanex fired her at least in part because she failed to behave in a way her manager considered appropriate for women. Therefore, the grant of summary judgment is REVERSED and the case is REMANDED to the district court for trial.