In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1275

VALERIE T. FILAR,

*Plaintiff-Appellant,*

*v.*

BOARD OF EDUCATION OF THE CITY OF CHICAGO,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 4679—**Charles R. Norgle**, *Judge.*

———————

ARGUED JANUARY 25, 2008—DECIDED MAY 22, 2008

———————

Before FLAUM, ROVNER, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Valerie T. Filar formerly taught as an untenured, full-time teacher in the Polish bilingual education department at the Edwin G. Foreman High School in Chicago. In 1999, the Board of Education of the City of Chicago, then known as the Chicago School Reform Board, approved a decision by Foreman's principal to change Filar's status from a full-time teacher at Foreman to a substitute teacher who would fill vacancies in other Chicago public schools as they arose. Filar, who was 69 at the time, objected to the decision for at

least two reasons. In the first place, she suspected that Foreman's principal had deliberately retained younger teachers in the bilingual program at her expense. In addition, Filar's osteoarthritis and dependence on public transportation made getting to the city's various schools difficult, and the Board denied her request that she only be assigned to schools that were easily accessed from bus stops. This lawsuit followed, alleging age discrimination and that the Board failed to reasonably accommodate Filar's disability. The district court granted the Board's motions for summary judgment on both claims, and this appeal followed. For the reasons set out below, we reverse the district court's grant of summary judgment with respect to the age discrimination claim but affirm with respect to Filar's disability claim.

## I.  Background

Filar's claims stem in large measure from allegations that the principal of Foreman High School made questionable personnel decisions that resulted in her ouster from Foreman. Understanding these allegations requires some background on Illinois's bilingual education program and the (elaborate) mechanics of a principal's relationship with the teachers in her school. Illinois law requires the State's school districts to establish programs of transitional bilingual education for students of limited English-speaking ability. ILCS §§ 5/14C-1, C-3. To staff these programs, school districts offer a transitional bilingual teaching certificate to qualified individuals proficient in both English and a foreign language, known as a Type 29 certificate. ILCS § 5/14C-8. The Type 29 certificate is a bridge certification; teachers can teach students with limited English skills while working for a standard teach-

ing certificate, which for secondary schools like Foreman is called a Type 09 certificate. *Id.*; *see generally* ILL. ADMIN. CODE tit. 23, § 25.90 (2008) (containing current qualifications). Once a teacher has attained the standard teaching certificate, she has to obtain both a bilingual "approval," which attests to her ability to provide a bilingual education, and "endorsements," which are descriptors like "Mathematics" or "Reading" that indicate the subject matters she is competent to teach. *See, e.g.,* ILL. ADMIN. CODE tit. 23, § 25. app. E (listing representative endorsements as of July 1, 2004).

Even with the proper certifications, a would-be teacher in Illinois must still get hired, and not all teaching positions are the same. Public schools in Chicago employ several different categories of teacher, each with its own moniker and level of job stability. The most secure are tenured teachers, whom a principal can only remove for "cause." 105 ILCS 5/34-84. Below tenured teachers are tenure-track or "appointed" teachers who work full time with a particular class at a specific school, and, as their name suggests, can eventually obtain substantial job security. There are also at least two kinds of non-tenure-track teachers: "cadre" substitute teachers move from school to school to cover temporary vacancies on a daily basis; and full-time basis or "assigned" substitutes work at one school full time, just like tenure-track teachers only with less seniority and without the potential job security.

Principals have wide discretion in moving a school's teachers from a full-time basis position onto the tenure track. But how many full-time teachers a school can employ in a given year derives in large measure from the principal's available budget for the school year. Among

other things, the annual budget from the Chicago Board of Education and the Budget Office lists how many positions the Board will fund in a given school year for each school program. In addition to Board-funded position, the principal may also have a certain number of teaching positions at his school funded by the State of Illinois. When the school does not have enough funded positions for all its teachers, the principal may have to "displace" unfunded teachers; that is, recategorize either tenure-track or full-time substitute teachers as "cadre" substitutes who must then fill vacancies in other city schools as they arise.

When that happens, the principal displaces teachers in reverse order of seniority. A less senior full-time basis substitute in a given subject or program will go before a more senior one; and a tenure-track teacher will not go until the principal has displaced all of the full-time basis substitutes. Although the principal possesses substantial authority to make personnel decisions, it's not absolute. The principal must first send a personnel request to the Board's Human Resources Department. There, someone determines whether the decision complies with the Chicago Teachers Union's collective bargaining agreement and whether the teacher has the requisite certifications. Then, based on these criteria, Human Resources either approves or denies the decision.

This case arises from the events immediately before and after Filar's displacement in 1999. Filar was born on January 11, 1930 in Poland. In 1991, she received her Type 29 certification and, the next year, Foreman's principal, Dr. John Garvey, hired her to teach Computers in the school's Polish bilingual program as a full-time basis substitute. Not long after he hired Filar in 1992, Dr. Garvey displaced her, although after Filar filed a grievance she

was soon reinstated. While Filar was fighting her displacement in 1992 and 1993, Dr. Garvey hired two more teachers for the school's Polish bilingual program—Piotr Monaco (born in 1957) and Kornelia Rydberg (born in 1960)—both of whom had Type 29 certifications. In September 1997, Filar received her Type 09 standard teaching certification with endorsements in Accounting and Computers, and, a month later, she obtained her bilingual approval.

The parties dispute exactly when and how Dr. Garvey made the determination, but at some point in 1999 it became clear to him that the demand had fallen somewhat for bilingual Polish education due to a decrease in enrollment. In the school year beginning 1998, Foreman had five Board-funded positions for the Polish bilingual program; for the 1999 school year, it would lose one. What followed was a flurry of personnel decisions that would change the program and the employment status of the teachers. Two such decisions affected the other full-time substitute teachers then in the program. On July 23, 1999, Dr. Garvey sent a request to the Board that Monaco be appointed to a tenure-track position. Monaco had received his Type 09 certification in March 1999, but he had yet to receive his bilingual approval. And on September 3, 1999, two days after the school year began, Dr. Garvey sent a similar request that Rydberg be appointed to a tenure-track position. Rydberg had obtained her Type 09 certification on August 18, 1999, but also had yet to receive her bilingual approval.

On September 12, 1999, Dr. Garvey then slotted a new teacher into the Polish bilingual program when he requested that the Board move a tenure-track teacher, Helena Danielska (born in 1939), into the program.

Danielska had her Type 09 certification with an endorsement in mathematics and a Type 29 certificate with a Polish-bilingual endorsement. In moving Danielska into the program, Dr. Garvey moved Filar from a state-funded position to a Board-funded position and then put Danielska into Filar's old state-funded position. The Board approved the change on September 14. Finally, on September 15, Dr. Garvey hired Elaine Guzman as a tenure-track teacher to teach ESL Computers at Foreman. Guzman had the certifications needed to teach at elementary school but needed special permission to teach because she did not yet have the Type 09 certification to teach high school students.

As things stood on September 17, 1999, Filar was the only full-time basis substitute in the Polish bilingual program and she had moved from a state-funded position to a Board-funded position. That same day, Dr. Garvey informed Filar that he was displacing her to the cadre. Following her displacement, Filar reported to the Office of Culture and Language, the department in Chicago Public Schools that is responsible for administering bilingual programs. Filar claims that someone at OCL told her to return to Foreman because her position was not being closed. Filar then returned to Foreman and on September 27, 1999 she received a second letter from Dr. Garvey stating that she was being displaced to the cadre. After she received this second letter, Filar reported to the Board again and she was told to return to Foreman as a cadre substitute. But when she arrived, Dr. Garvey refused to accept her as a cadre substitute at Foreman, explaining later in his deposition that he was concerned over the bad blood from the displacement and the potential disruptive effect it might have on the school.

Filar then filed a grievance challenging her displacement. In December 1999, Dr. Garvey submitted a letter regarding his decision to displace Filar. He stated that he had displaced her because "she was the least senior member of the faculty in the Polish Bilingual Program" and the "decrease in enrollment in the Polish program necessitated a decrease in the staff. Ms. Filar was the only [full-time basis substitute] left in the Polish Bilingual program at this time and was displaced for that reason."

Filar's new role as a cadre substitute was complicated by the fact that she suffered from osteoarthritis. Filar's arthritic hip made walking long distances difficult, and she could not drive herself to work. In November 1999, she requested an accommodation for her disability from Chicago Public Schools. She wanted to be staffed at "one place of work with minimum walking distance from public transportation." The Board denied her request, stating that cadre substitutes "must report to whichever school the Substitute Center assigns [them] to on the day that [they] receive the assignment" and that her request was "not a matter for work-place reasonable accommodation."

This lawsuit followed in July 2004, alleging age discrimination under the Age Discrimination in Employment Act based on her September 1999 displacement and that the Board violated the Americans with Disabilities Act by failing to accommodate her disability. After discovery, the Board filed its motion for summary judgment as to both claims, which the district court granted. As to Filar's discrimination claim, the court reasoned that she had failed to show a similarly situated employee and thus could not prove her prima facie case. Even if she could, the court reasoned, Filar had presented insufficient evidence

of pretext for the case to proceed to trial. As for Filar's ADA claim, the court reasoned that the Board had no obligation to staff her at schools near public transportation. Because proximity to public transportation did not affect her ability to actually teach in a classroom, the accommodation she had requested was not related to the "essential functions of the employment position," scotching her ADA claim. This appeal followed.

## II.  Discussion

Filar raises two general issues on appeal, tracking her two causes of action. First, she claims that the district court erred in granting the Board's motion for summary judgment as to her age discrimination claim. Second, she argues that the district court had an unduly cabined view of the "essential functions" of the cadre substitute teacher and thus erroneously granted the Board's summary judgment motion as to her ADA claim. We review both claims de novo, drawing all reasonable inferences in Filar's favor. *EEOC v. Bd. of Regents of University of Wisconsin Sys.*, 288 F.3d 296, 301 (7th Cir. 2002). The following sections discuss each in turn.

### A.  ADEA Claim

As she did before the district court, on appeal Filar challenges her displacement from Foreman in September 1999, alleging that age discrimination, and not some legitimate personnel concern, was the engine behind Dr. Garvey's decision. Filar chose to prove her case indirectly through an adapted version of the burden-shifting framework first announced in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973).[1] As applied to employment actions like displacement, if a plaintiff establishes her prima facie case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action; after which the burden shifts back to the plaintiff to present some evidence that this reason is a pretext for discrimination. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). This procedural device sharpens the factual issues for a possible trial; the employer must provide some reason for its action that a plaintiff can attack, rather than stand mute except to deny the sufficiency of the plaintiff's evidence. Filar raises several issues related to this framework, discussed in turn in the sections that follow.

### 1. Appropriate Prima Facie Case

Filar argues first that the court used the wrong set of factors to evaluate her prima facie case. The district court applied the familiar four-factor prima facie case for ad-

---

[1] Filar's brief justifies this decision as resulting from a lack of "direct evidence of discrimination." But despite the nomenclature," 'direct' proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (*e.g.,* 'You're too old to work here.'), but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Atanus v. Perry*, ___ F.3d ___, 2008 WL 696908, *5 (7th Cir. 2008). One can question whether the differences that remain between the "direct" and "indirect" methods are more a result of history than logic. In any event, Filar's claimed lack of "direct" evidence is not necessarily a sufficient reason to scuttle a "direct" method claim.

verse employment actions requiring proof that (1) Filar was over age forty; (2) her job performance met Dr. Garvey's expectations; (3) she suffered an adverse employment action; and (4) the employer treated "similarly situated" employees at least ten years younger more favorably. *See Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006). On appeal, Filar instead characterizes her displacement as being part of a mini-reduction in force. When an employee is dismissed as part of a mini-RIF, the dismissed worker's duties are spread out among the remaining employees. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690 (7th Cir. 2006). The retention of younger employees who take on the dismissed employee's responsibilities "is nothing more than a demonstration of more favorable treatment, particularly tailored to the factual circumstances of a mini-RIF case." *Id.* at 690 n.1. As a result, the prima facie case in this context swaps the fourth requirement in the basic framework—that a similarly situated younger employee was treated more favorably—with another—that her duties were absorbed by younger workers who were retained following the mini-RIF. *Id.* at 690-691. Thus, in Filar's estimation, the district court applied the wrong standard and thus erred in requiring proof that "similarly situated" younger teachers were treated more favorably.

The district court cannot be faulted for failing to employ the mini-RIF standard because a mini-RIF claim was not fairly before it. Filar's complaint did not include allegations consistent with a mini-RIF claim. And in her response to the defendant's motion for summary judgment, Filar argued that a reduction in force, the regular-sized variety, precipitated her displacement. As this Court has explained, the relevant factual inquiry in a reduction-

in-force case is not the same as a mini-RIF case. In the former, a plaintiff's position was eliminated entirely and will not be refilled whereas "[t]he point of a mini-RIF unlike a true RIF, is that the job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively 'replaced,' not eliminated." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000).

The practical effect of this formal difference, one that is fatal to Filar's claims, is that the type of proof expected of a mini-RIF claim is different than that stemming from a formal RIF. For her mini-RIF claim, Filar had to show that her position was "absorbed" by the remaining younger co-workers, not just eliminated. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). But Filar did not purport to make this showing in either her memorandum in opposition to the Board's motion for summary judgment or her Local Rule 56.1 statement of facts.[2] Instead, the thrust of her RIF argument consisted of a statement that "younger workers . . . were favorably retained in the RIF while [she] was displaced." An apt statement of her evidentiary burden in a RIF

---

[2] Filar's presentation of the evidence in her Local Rule 56.1 statement of the facts was also inconsistent with a mini-RIF claim. On appeal, she only points to two facts from her statement—that Rydberg and Monaco taught computers in the 1999 school year—to support her mini-RIF claim. That these two were teaching computers, a subject that Filar had taught prior to displacement, does not mean that they "absorbed" her duties after her departure. To show that, something more would be needed—for example, a showing that this was an increase in their duties. *Michas*, 209 F.3d at 693. In any event, the mini-RIF claim was simply not before the district court, as a legal matter or as represented by the facts.

claim, but not a mini-RIF one. In short, the district court did not err in its treatment of Filar's claim because it was never asked to treat such a claim. *See Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997). Accordingly, the district court applied the right prima facie case.

### 2. "Similarly Situated" Younger Employees

Even so, did it apply the standard correctly? The parties agree that (1) Filar was over forty in September 1999; (2) she was meeting the school's legitimate employment expectations; and (3) she suffered an adverse employment action—three of the four elements of her prima facie case. But the parties dispute whether Filar presented a "similarly situated" younger employee who was treated more favorably. The district court rejected each of Filar's proposed comparators because, prior to Filar's displacement, each was a tenure-track teacher, not a full-time substitute like Filar. Because tenure-track teachers do not compete with full-time substitutes in terms of seniority, the court reasoned, Filar could not point to them as "similarly situated" younger employees and thus could not establish her prima facie case.

We disagree. Whether two employees are "similarly situated" is a common sense inquiry that depends on the employment context. *Radue*, 219 F.3d at 618. The purpose of the prima facie case is to ensure that there is enough evidence to raise the specter of discrimination, justifying judgment for the plaintiff if the employer does not provide a legitimate business reason for its action. *See Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995). All things being equal, if an employer takes an action against one employee in a protected class but not another outside that

class, one can infer discrimination. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). The "similarly situated" prong establishes whether all things are in fact equal. *Id.* To make this showing, a plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces. But the comparator must still be similar enough "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable: complaints about discrimination." *Id.*

Two of the comparators offered by Filar—Rydberg, 42, and Monaco, 39—were "similarly situated" younger employees for purposes of her prima facie case. All three had taught at Foreman for roughly the same period of time. Dr. Garvey hired Filar in 1992 and he hired both Rydberg and Monaco soon thereafter while Filar was grieving her original displacement. All three were properly certified, and by all measures their duties were the same. To the extent that their certifications differed at the time that Dr. Garvey displaced Filar, it was because Filar had received her Type 09 teaching certificate in 1997 whereas Rydberg and Monaco had only attained it in 1999. In addition, Filar's Type 09 certificate had the bilingual approval whereas neither Rydberg's nor Monaco's did. Dr. Garvey supervised all three teachers, and, as far as the record shows, none had any disciplinary or performance issues at the time of Filar's displacement. Dr. Garvey considered Filar to be a good teacher; he had consistently rated Filar's performance evaluations as "Superior" or "Excellent" from 1994 through 1999. The record does not indicate what scores Rydberg and Monaco received, but given Filar's high marks we can assume

for present purposes they were similar in this regard as well.

Despite these similarities, the district court considered their differences in seniority to be fatal to any showing of similarity. As the court correctly noted, full-time substitutes were less senior to tenure-track teachers for purposes of displacement. And, unlike Filar, both comparators were tenure-track teachers. In some circumstances, differences in seniority will preclude a showing that two employees are "similarly situated" or of age discrimination more generally. To the extent that seniority is a simple proxy for something like the length of employment and is something that an employer must credit when making employment decisions, differences in seniority will tend to make two employees dissimilar for purposes of the plaintiff's prima facie case. *See, e.g., Doe v. First Nat. Bank of Chicago*, 865 F.2d 864, 877 (7th Cir. 1989) (crediting comparator's "long tenure" in denying that she was "similarly situated"). This is because, in making the employment decision, the employer had to credit a factor over which it had no control, and thus a finding of intentional age discrimination would be implausible given that the employer's "intent"—discriminatory or otherwise—was largely irrelevant to the decision. Had this been the case at Foreman, the district court would have been right to conclude that Filar was not "similarly situated" to tenure-track teachers.

But where seniority is unmoored from everything but the discretion of the employer, the simple fact that the comparator is more senior to the plaintiff may not be dispositive, even where the employer must credit seniority in employment decisions. An employer could exercise its discretion in conferring seniority in a discriminatory fashion, making an immediately subsequent employment

action based on seniority discriminatory as well. In a related context, we have held that an "employer cannot frustrate the statute merely by assigning every employee a different job title." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). Similarly, an employer cannot defeat a claim of discrimination by giving younger employees greater seniority rights immediately before displacing an older, but less senior, employee.

This is not to say that Dr. Garvey and the Board have done so in this case. But the district court concluded that the differences in seniority alone were sufficient to defeat a finding that Filar's comparators were "similarly situated." Given the manipulability of seniority at Foreman, this was error. Although seniority had some bite to it when a principal had to displace teachers—by rule, less senior teachers went before more senior—the conferral of seniority itself consisted of nothing more than a mine-run, discretionary personnel decision made by the principal. *But see Adelman-Reyes v. Saint Xavier University*, 500 F.3d 662, 667 (7th Cir. 2007) (discussing reluctance of court to get involved in tenure decisions where accompanied by "multiple layers of independent review"). In addition, as seen above, a teacher that a principal moved to a tenure-track position did not thereby obtain greater duties. Nor did the principal necessarily make the decision solely on the basis of some difference in the teachers' respective qualifications—something that might otherwise preclude a showing of "similarly situated." Whether on the tenure track or a full-time substitute, all three were teachers with, as far as the evidence shows, nearly identical responsibilities and qualifications. *See Bellaver*, 200 F.3d at 494 (stating that comparators and plaintiff "had the ability to perform each other's tasks, even though

they had different titles and specific responsibilities"). In short, although principals are free to make seniority decisions as they see fit—just as any employer can move an employee from one job to the next—the differences in seniority here were not inconsistent with intentional discrimination, as the district court implied. As a result, in light of the other factors listed above, Filar has pointed to two "similarly situated" younger employees to establish her prima facie case.

### 3. The Board's Legitimate Non-Discriminatory Reason and Filar's Evidence of Pretext

Filar having established her prima facie case, the Board must articulate a legitimate business reason for displacing her and not the younger teachers. Before the district court and here on appeal, the Board has pointed to the decline in enrollment in the Polish bilingual program combined with the fact that Filar was the least senior teacher in the program. The issue now is whether this reason was pretextual. Showing pretext requires "[p]roof that the defendant's explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000); *see also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) ("Pretext is a 'lie, specifically a phony reason for some action.'"). The plaintiff's ultimate burden is to show that intentional age discrimination motivated the employer's action, but marshaling such evidence does not always require a smoking gun or an eyewitness to the employer's discriminatory designs; "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147. Thus, in certain circumstances, "a plain-

tiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.*

We conclude that Filar has presented enough evidence to undermine the Board's claim, specifically the evidence of the timing and effect of the series of personnel decisions Dr. Garvey made over the summer and fall of 1999. A jury could conclude that the only reason that Filar was the least senior full-time substitute at the time of the displacement decision was because Dr. Garvey had put her, and not the younger teachers, in that position. First, in spring 1999, Dr. Garvey knew that the demand for Polish bilingual education would decrease. An affidavit and summary chart from Rosa Vazquez, the Executive Administrator in the Department of Language of Culture, indicated that Foreman would lose one Board-funded position between 1998 and 1999, though the date of this report was the fall of 1999. In her deposition, she stated that school principals received a similar report estimating prospective demand for school programs in the spring of every school year. In addition, this information would be available "live" to school principals throughout the year. Stephen Heller, a Human Resources specialist, similarly described the staffing process as being ongoing throughout the school year, including through the use of projections. Thus, the evidence, viewed in the light most favorable to Filar, shows that in spring 1999 Dr. Garvey knew he would be losing one Board-funded position.[3]

---

[3] Filar makes at times contradictory claims regarding when Dr. Garvey actually knew that someone would need to be

(continued...)

Second, in spring and summer 1999, Dr. Garvey made personnel decisions to move Filar from the most to the least senior full-time substitute position. At the end of the 1998 school year, Filar was still a full-time basis substitute, having a slightly longer tenure than either Rydberg or Monaco. In March 1999, Rydberg received his Type 09 certificate, though not the bilingual approvals, and on July 23, 1999 Dr. Garvey appointed Rydberg to a tenure-track position. On August 18, 1999, Monaco received her Type 09 certificate, similarly without her bilingual approvals, and on September 3, 1999, Dr. Garvey appointed her to a tenure-track position. In justifying his decisions to move Rydberg and Monaco, but not Filar, to tenure-track positions, Dr. Garvey said that it was based on his "judgment" that they were "more suited to the position." But in later explaining how he exercised this "judgment," Dr. Garvey could not recall any of the specifics. Third, on September 12, 1999, Dr. Garvey moved Filar out of a state-funded position—which would remain funded—into a Board-funded position—which would not. He then displaced Filar.

---

[3] (...continued)
displaced. On the one hand, she says that Dr. Garvey "embarked on a plan to displace Filar that dated back to the early summer of 1999." And that he wanted "to isolate Filar as the only [full-time substitute] in the Polish bilingual program." But in the next breath, she claims that staffing needs could not be made until the fall of 1999, which is hard to reconcile with her argument that Dr. Garvey bent procedural personnel rules to his designs from the "early summer of 1999." Because the record does not support her latter claim, we construe her more general claim consistently with what the record does support.

Up to this point, the evidence is consistent with both a desire to oust Filar—for whatever reason—and an intent to discriminate against her because of her age. Nonetheless, the differential treatment afforded Filar and her younger colleagues, along with the timing of Dr. Garvey's decisions, inch Filar's case forward and satisfy us that an issue of fact exists as to discrimination. First, Dr. Garvey failed to appoint Filar once she was properly certified but almost immediately appointed younger teachers to more senior positions. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination."); *see also Fischer v. Avanade, Inc.*, 519 F.3d 393, 405-06 (7th Cir. 2008). Filar had received her Type 09 certification in 1997. Despite the fact that it was fairly common for full-time substitutes to become tenure-track teachers after receiving this certification, Filar did not move once she received her Type 09 certification. But when Rydberg, 42, and Monaco, 39, received their certifications in spring and summer 1999, Dr. Garvey almost immediately made them tenure-track teachers. Filar maintained "Superior" and "Excellent" in her reviews, and in his deposition Dr. Garvey could not give any reason for failing to move Filar to the tenure track except that "he felt these [other] teachers suited [tenure-track positions] better." Because the only salient difference between Filar and the younger teachers was age, a jury could conclude that age motivated Dr. Garvey's decisions.

In addition, the timing of Dr. Garvey's appointment of Monaco and Rydberg was questionable. Both Rydberg and

Monaco went from full-time substitutes to protected tenure-track teachers immediately before Dr. Garvey displaced the least senior full-time substitute. Without first making these two personnel moves, Dr. Garvey would have needed to displace a younger teacher, and not Filar. When viewed with Filar's prima facie case and the other evidence, this evidence of Dr. Garvey's seemingly strategic behavior would be sufficient to support a finding of discrimination.[4]

---

[4] This case also implicates a line of reasoning in our case law that deserves mention. This Court has held that an "inference of nondiscrimination" in age discrimination cases arises when the plaintiff is already over 40 when hired and the same person does the hiring and the firing. *See, e.g.*, *Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1045 (7th Cir. 2000); *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 399 (7th Cir. 1997). This inference has the most bite where "a relatively short time span" separates the two. *See Ritter*, 231 F.3d at 1044 (two years), *Chiaramonte*, 129 F.3d at 399 (termination followed two years after retention of employee in merger); *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994) (two years). This is because it is unlikely that a decisionmaker developed an "aversion to older people" in the "relatively short time span" between hiring and firing. *Chiaramonte*, 129 F.3d at 399. Here, Filar was well within the protected class, 62 years old, when hired by Dr. Garvey, who ultimately displaced her. Nonetheless, two considerations convince us that this inference of nondiscrimination is not controlling in this case. First, Filar's hiring and displacement were seven years apart, a period sufficient to dull the inference that Dr. Garvey had not discriminated. Aside from flagrant ageism—or an "aversion to older people"—the ADEA aims to curb actions based on an employer's unfair assumptions about an older worker's productivity. *See General Dynamics*

(continued...)

---

[4]  (...continued)
*Land Systems, Inc. v. Cline*, 540 U.S. 581, 586-87 (2004); 29 U.S.C. § 621(a)(2) (2006). As workers age, their marginal productivity may fall and the costs of retaining them may rise, whether through higher benefits costs or the higher salaries they've earned. *Cline*, 540 U.S. at 586-87. As a result, employers might think that younger workers can do the same work as older workers at a lower price, whether measured in time or money. Giving effect to these assumptions by swapping the older with the younger worker would be an act of age discrimination. *Hazen Paper Company v. Biggins*, 507 U.S. 604, 610 (1993) ("It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age."). For this reason, the fact that a worker was within the protected class when hired might not be as telling in some cases: An employer may assume an over-forty employee is productive when hired but not years later. It may be reasonable to assume that Dr. Garvey did not have an "aversion to older people" because he hired Filar when she was 62. But it's just as reasonable to assume that Dr. Garvey viewed Filar as productive at 62 but not at 69. Second, placing too strong a reliance on an inference of nondiscrimination may go too far at the summary judgment stage. In Filar's case, this inference would be in favor of the party moving for summary judgment. But the Supreme Court and this Court have recognized that summary judgment in discrimination cases should not be treated differently than other kinds of cases. *See Reeves*, 530 U.S. at 148 ("[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact.'") (quoting *St. Mary Honors Center v. Hicks*, 509 U.S. 502, 524 (1993)); *Adams*, 231 F.3d at 428. Under Rule 56, "the drawing of legitimate inferences from the facts are jury functions," and the court "must disregard all evidence favorable to the moving party that the jury is not required to

(continued...)

The ultimate verdict in this case is by no means a fore-gone conclusion. A jury could conclude that Dr. Garvey just wanted to displace Filar because that was the best decision for the school. Or the jury could surmise that Dr. Garvey meant to ditch an older worker by giving younger teachers seniority immediately prior to making a seniority-based personnel decision. Because the evidence slightly preponderates towards the latter and because of the Supreme Court's "cautionary note not to grant summary judgment too readily when facts are susceptible to two interpretations," *Adams v. Ameritech Svces., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000); *see also Gordon*, 246 F.3d at 893, granting the Board summary judgment on this claim was unwarranted, and we therefore reverse.

## B. ADA Claim

Filar also appeals the district court's order granting the Board's motion for summary judgment as to her failure to accommodate claim under the Americans with Disabilities Act. The ADA prohibits "discriminat[ion] against a quali-fied individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and other privileges of employment." 42 U.S.C. § 12112(a). Discriminating against a "qualified individual with a

---

[4] (...continued)
believe." *Reeves*, 530 U.S. at 150-51 (so describing the approach under Rule 50 where "the inquiry . . . is the same"). In light of the above, we do not believe that a jury is required to believe that Dr. Garvey did not discriminate against Filar when she was 69 just because he hired her when she was 62. Thus, the inference of nondiscrimination does not control in this case.

disability" means, as is relevant to Filar's claim, not making a "reasonable accommodation" where doing so would allow a disabled employee to "perform the essential functions of the employment position" without imposing an "undue hardship" on the employer. *See* 42 U.S.C. §§ 12112(b)(5)(A) (reasonable accommodation and undue hardship); 12111(8) (definition of "qualified individual with a disability"). In other words, if the employer can make reasonable changes to features of the job or the work environment so that a disabled person can work satisfactorily, the employer has to make those changes.

As discussed, Filar has an arthritic hip that makes walking long distances difficult. After Dr. Garvey displaced Filar from Foreman to the roving cadre of substitutes, she requested that the Board staff her at "one place of work with minimum walking distance from public transportation," listing Foreman High School and three other acceptable schools. Later, the Board denied her request for an accommodation. In a letter from the ADA Administrator in the Human Resources department, the Board stated that displaced cadre teachers "must report to whichever school the Substitute Center assigns [them] to on the day that [they] receive the assignment." How the cadre teacher did this was "not a matter for work-place reasonable accommodation." The Board also stated that, "as a result of the School Reform Act, Central Office cannot unilaterally assign an employee to a school as an accommodation without the acceptance and approval of the principal of the receiving school."

Filar argued below that the Board should have granted her request, but the district court disagreed. In dismissing Filar's disability claim, the court held that Filar was not a "qualified individual with a disability" because she had

not "allege[d] that this hip condition substantially prohibits her from conducting her job as a teacher." And her "proximity to public transportation does not affect the way in which she teaches Polish in her capacity as a substitute teacher."

Now on appeal, Filar claims this was error. We affirm the district court's dismissal of this claim, though for different reasons. The fact that Filar's hip condition did not affect her ability to teach, which the district court credited, does not end the matter; she can still be a "qualified individual with a disability." The ADA defines this term of art as an "individual with a disability who, *with or without reasonable accommodation*, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). As the text indicates, that an employee can "perform the essential functions" of a teaching position despite her disability and "without reasonable accommodation" does not exclude her from the definition of a "qualified individual with a disability." To put it another way, an "*un*qualified individual with a disability" would be someone with a disability who could not do the job no matter what the employer did to reasonably accommodate. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005).

Instead, the question is whether her requested accommodation was reasonable, and we don't think it was. The ADA does not exhaustively define a "reasonable accommodation," though the term "may include . . . making existing facilities used by employees readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12111(9)(A). Because walking long distances from the bus stop makes it difficult to access certain schools, Filar argues that her request was for something akin to this

type of accommodation. In support of her claim, she cites to this Court's decision in *EEOC v. Sears Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005). In *Sears Roebuck*, we held that an employer had not done enough to make the disabled employee's work station accessible to her. Due to her disability, the plaintiff had problems walking long distances. When one supervisor told her she could use a shortcut through another department or eat in a stockroom near her work station, a different supervisor would either rescind the offer or discipline the plaintiff for her actions. In addition, Sears gave the plaintiff a parking spot reserved for disabled employees, but it did nothing to shorten her walk to her work station. Something more, we held, was necessary: "these were not reasonable accommodations because they did not consistently or effectively make the Sears facility accessible to" the plaintiff. Reasoning by analogy, Filar urges us to reach the same conclusion here, saying that her workplace—any one of the schools she would need to work in on any given day—was similarly inaccessible unless near a bus stop.

At the highest level of abstraction, Filar's claim has some surface appeal. In addition to the obligations discussed in *Sears Roebuck*, this Court has held that reassignment to a vacant position can be part of the employer's obligation to reasonably accommodate. *See DePaoli v. Abbott Laboratories*, 140 F.3d 668, 675 (7th Cir. 1998). Without knowing the particulars of the Board's cadre-assignment policies, Filar might appear to be requesting just such a "reassignment," only to a specific subset of the schools in the Chicago Public Schools that would be "accessible" to public transportation.

But three aspects of the request convince us that it was just not reasonable. First, based on the requirements of a

cadre substitute, Filar's request would have amounted to preferential treatment, which the ADA does not require. *Williams v. United Ins. Co. of America*, 253 F.3d 280, 282 (7th Cir. 2001). The collective bargaining agreement between the Board and the Chicago Teachers Union requires cadre teachers to be "continuously available to perform substitute service" and to "accept all assignments in any and every school" as they became available. Under the ADA, an "employer is not required to give the disabled employee preferential treatment, as by . . . waiving his normal requirements for the job in question." *Williams*, 253 F.3d at 282. Here, Filar was in essence requesting to opt out of the cadre-assignment system; she only wanted "one place to work" and not to be subjected to the far-reaching assignment system applicable to cadre substitutes, which may have made access to the schools difficult. Nor would she be "available" as a substitute in the event that she was assigned to a school that did not fit her request. This falls well short of the cadre substitutes' obligations and is thus more than the ADA requires of the Board.

Second, the Board did not have the authority to assign a cadre substitute to "one place to work." Under the collective bargaining agreement, the Board itself was not responsible for slotting teachers at particular schools. Instead, the cadre substitute would be "given the opportunity to apply and be interviewed for vacant positions." And the principal could select a member of the cadre to be a full-time substitute "at any time . . . to fill an existing vacancy." The principal's personnel decisions, as discussed in the previous section, resulted largely from the discretion he or she enjoyed. The Board could not require a principal to take a particular cadre substitute, as Filar requested.

Finally, even assuming that something could be arranged with Filar under the collective bargaining agreement, the administrative burden posed by Filar's request would have been prohibitively weighty. The plaintiff must make a prima facie showing "that the accommodation is reasonable in the sense both of efficacious and of proportional to costs." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). The initial showing made by Filar in her request for an accommodation was simply too barebones to show that the request was reasonable. There are at least 655 public schools in the Chicago Public Schools system, including 116 high schools. *See* CPS At A Glance, http://www.cps.k12.il.us/AtAGlance.html (last visited May 14, 2008). And the CTA has approximately 2000 buses that operate over 154 routes with 12,000 bus stops. *See* CTA Overview, http://www.transitchicago.com/welcome/overview.html (last visited May 14, 2008). In her request for accommodation and her appeal before this Court, Filar has not given any indication of how many of the 116 high schools would qualify besides the four that she listed in her request for an accommodation. Thus, the Board had the option of either assigning her to one of the four schools she requested—in violation of the collective bargaining agreement—or researching those schools in the City that satisfied her needs—a costly task. Neither option is reasonable. For all these reasons, the district court did not err in rejecting Filar's ADA claim.

### III. Conclusion

For the foregoing reasons, we REVERSE the district court's order of summary judgment as to Filar's age

discrimination claim and A<small>FFIRM</small> the district court's order of summary judgment as to Filar's disability claim.